## Edward Shields et al. v. The People of the State of Illinois.

### Gen. No. 13,103.

1. GRAND JURY—*when appears to have been properly sworn.* A contention that it does not appear from the record that the foreman of the grand jury which voted the indictment was properly and separately sworn, as required by statute, is fully answered by the recital of the record that "the grand jurors were duly sworn."

2. PRODUCTION OF DOCUMENTS—*when demand for, made in criminal prosecution in presence of jury, not improper.* A demand by the state's attorney made of a defendant that he produce a voucher, is not improper, where such demand is made for the purpose of removing the objection that had been interposed by such defendant to the effect that such voucher was the best evidence of the matter under investigation by such state's attorney.

3. CROSS-EXAMINATION—*when not unduly restricted.* It is within the discretion of the trial judge to allow or disallow questions upon the cross-examination of a witness which affect his family relations and his habits in connection with disreputable women, where such witness was an accomplice of the defendant convicted, and was turning state's evidence.

4. ASSAULT—*what evidence competent in prosecution for conspiracy to commit.* In a prosecution for conspiracy to commit an assault, it is competent, in addition to showing what took place at the time of the assault in question, to introduce evidence as to the ensuing condition of the party assaulted, his death following, the results of an autopsy, etc.

5. ASSAULT—*when punishment for conspiracy to commit, not excessive.* A sentence is not excessive in a prosecution for conspiracy to commit an assault merely because the sentence imposed was

greater than could have been imposed had the prosecution been merely for the making of an assault.

6. Stenographic transcript—*how preliminary proof of, made.* In seeking to prove a stenographic transcript it is proper to have the stenographer swear to the correctness of the transcript as a whole, and it is not essential to require that the stenographer who made such transcript testify separately with respect to the correctness of each question and answer contained in such transcript.

7. Incompetent evidence—*when admission of, will not reverse.* The admission of incompetent evidence will not always work a reversal of the judgment of conviction where the competent evidence clearly justified the verdict.

8. Variance—*what does not constitute, in criminal case.* In a prosecution for conspiracy to commit an assault, proof of the commission of an assault upon one person is not a variance from the indictment which charged that the conspiracy contemplated the commission of assaults upon a number of persons, including the person shown to have been assaulted.

9. Sentence—*what need not specify in criminal case.* A judgment of conviction need not specify that the defendants convicted be put at hard labor.

10. Parol Act—*repeal affected by.* Section 6 of Division 14 of the Criminal Code is superseded in the case of all crimes mentioned in section 1 of the Parol Act.

11. Confessions—*discretion of judge with respect to admitting, made to police officers.* It is within the discretion of the trial judge to admit or reject answers to question of officers to prisoners, and such answers should be rejected if there be reason to believe that a trap was being laid for a prisoner, and such confession should be received with caution.

12. Confession—*when incompetent.* A confession is incompetent where obtained from the defendant by the promise of a police officer of some collateral benefit or boon, even though no threat or promise was made in reference to the criminal charge in which such confession was made, unless it shall appear that there was no reason to suppose that the inducement held out was calculated to produce an untrue confession.

13. Fine—*when imposition of, erroneous.* The imposition of a fine in a judgment of conviction is erroneous where no punishment by fine was provided for in the verdict. ·

14. Fine—*when erroneous imposition of, not ground for reversal.* Where the verdict in a criminal case imposed punishment by imprisonment in the penitentiary and the judgment of conviction in that respect followed the verdict but also imposed a fine, the Appellate Court may correct the judgment of conviction and need not reverse the cause.

Shields v. The People.

· 15. CHANGE OF VENUE—*when application based upon alleged prejudice of inhabitants of county not improperly denied.* Even though there be no· counter-affidavits it is within the discretion of the trial judge to grant or refuse an application for the change of venue, made because of the alleged prejudice of the inhabitants of the county in which the trial is to take place and ·in considering such application it is proper for the judge to weigh. and consider what he himself judicially knows of the development of the trial, of the situation of the case, and of the facts alluded to in the application.

16. MOTION TO STRIKE—*when allowance of, cures error in admission of evidence.* The striking out of evidence improperly admitted cures the error in admission if the party claiming to have been prejudiced could have obtained a hearing upon the preliminary proof out of the presence of the jury and did not avail himself of the opportunity.

17. ACCOMPLICE—*evidence of, sufficient to sustain conviction.* A conviction may be had and sustained in a criminal case upon the uncorroborated testimony of an accomplice.

Criminal prosecution for conspiracy. Error to the Criminal Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the October term, 1906. Affirmed in part and reversed in part. Opinion filed April 4, 1907.

**Statement by the Court.** The plaintiffs in error were indicted in Cook county on May 23, 1905, together with George Meller, George·Miller, George Mullen, Frank Novak, and Edward Feeley, for conspiracy unlawfully to assault and beat one Christ J. Carlstrom and inflict bodily injury on him. Mullen was never apprehended or tried. Four counts of the indictment so described the offense charged; a fifth accused the defendants of a conspiracy to assault and beat divers persons. July 12, 1905, a motion to quash the indictment was allowed by the court as to the fifth count and overruled as to the others. The cause was called for trial September 11, 1905, and the examination of talesmen for the jury then began. It was continued from day to day until October 2, 1905, up to which time no juror had been selected. Four hundred talesmen had then been examined and forty persons challenged peremptorily. The rest had been excused for cause.

October 2, 1905, Henry Newman, with the consent of the other defendants, presented to the court a petition for a change of venue for his trial from the county of Cook, alleging that he feared for reasons therein set forth he could not receive a fair trial in Cook county because of the prejudice of the inhabitants thereof against him, which prejudice, the petition says, petitioner "never fully realized" until September 30, 1905. (Incorrectly abstracted *April* 30, 1905.) The petitioner filed various affidavits in support of the petition. On motion of the People the court denied said petition.

The selection of the jury was completed by December 4, at which date the trial proper began. It continued for almost four weeks.

During the selection of jurors George Meller withdrew his plea of not guilty and pleaded guilty. He afterwards appeared as a witness for the prosecution. During the taking of testimony for the prosecution the state's attorney entered a *nolle prosequi* as to George Miller. At the conclusion of the state's case the defendant Feeley was found not guilty by direction of the court, but motions of the other defendants respectively for peremptory instructions were denied. After the evidence for the defendants had been heard and the jury instructed, a verdict of not guilty was returned as to the defendant Novak and a verdict of guilty as to each of the plaintiffs in error, Shields, Heiden, Deutsch, Gilhooly, Newman, Casey and Looney. The punishment of each was fixed by the jury at imprisonment in the penitentiary (for a period which under the Indeterminate Sentence Act cannot be less than one nor more than five years), and in addition Gilhooly was required by the verdict to pay a fine of $2,000. Judgments were rendered in accordance therewith, except that Looney was sentenced to pay a fine of $1,000 in addition to imprisonment (for which fine there was no warrant in the verdict), motions for a new trial by each of the convicted defendants and

motions in arrest of judgment having been overruled. To reverse these judgments the present writ of error has been sued out.

In this court the plaintiffs in error urge, under their assignments of error, that the Criminal Court erred: In overruling the motion to quash the indictment; in denying Newman's petition for a change of venue from Cook county; in the admission of improper evidence and the exclusion of proper evidence; in giving and in refusing instructions; and in overruling the motions for a new trial and the motions in arrest of judgment.

The motions for a new trial were predicated on the grounds, among others, that the verdicts were each and all contrary to the weight of the evidence and contrary to law, and that the punishments imposed on plaintiffs in error were excessive, unjust and unauthorized by the law. These propositions are also made in this court as reasons for reversal.

STEDMAN & SOELKE, for plaintiffs in error.

JOHN J. HEALY, State's Attorney, for defendant in error; FREDERICK L. FAKE, JR., and JAMES H. WILKERSON, of counsel.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

Many of the questions arising on this record are common to the contentions of all of the plaintiffs in error, but there are also some that are peculiar to one, or to some number less than the whole. As the judgment against each of the plaintiffs in error is a separate and individual matter, necessarily to be to some extent separately considered, we deem it most convenient to discuss in this opinion the case of each person separately and the contentions which are of significance as to him. Of course it will not be necessary, however, in so proceeding to make more than a

reference in the case of any defendant to questions already treated of in disposing of the contentions of another defendant. It will therefore be under those first considered that the greater part of the positions insisted on by plaintiffs in error must be discussed.

But before specifically discussing the objections urged to the judgment against one of the defendants separately it seems desirable to state the nature of the conspiracy alleged against all the defendants, and the result of that conspiracy as set forth by the State, which the evidence before the jury tended to prove.

All the defendants to the indictment, with the exception of Charles Gilhooly, Marcus Looney and Edward Feeley, were members of The Carriage and Wagon Workers Union Local No. 4—a labor organization having several hundred members and with headquarters on North Clark street in Chicago. It had been, in April, 1905, in existence for about four years. A strike had been called by it against certain employing wagon and carriage makers April 2, 1905. One of these employers was Fred L. Meckel, who had a wagon factory near the corner of 13th street and Wabash avenue, in Chicago. He had a man in his employ named Carlstrom. Carlstrom had been a member of the Union for two years and more, but was in arrears for dues when the strike was called. He did not leave his job. This was noted by members of the Union. Two of the plaintiffs in error, Newman and Casey, were picketing the Meckel shop shortly after the strike began, and Casey was seen talking with Carlstrom, who worked and was known in the Union under the name of Meyers. Carlstrom, after his day's work on April 13, 1905, shortly before five o'clock, started from the shop for his home at 3234 Princeton avenue, several miles away. On Princeton avenue between 31st and 32nd streets, Gilhooly and Looney, two of the plaintiffs in error, were lying in wait for him. The theory of the prosecution, on which Edward Feeley was indicted, was that he was the "trailer" or "dog", so-called, who had Carl-

strom pointed out to him by persons who wished Carlstrom slugged, and then in turn, after watching his movements and learning his habits, pointed him out and identified him to Gilhooly and Looney, who had undertaken the job of beating him. The trial court, however, did not find that there was sufficient evidence to hold Feeley, and during the trial instructed the jury to find him not guilty, which was accordingly done. We must therefore dismiss his supposed connection with the matter from consideration.

Gilhooly and Looney, however, for some purpose, and through the operation of some agency, were at the place before indicated between five and six o'clock. As Carlstrom came up to them Gilhooly, who was a large and tall man, got off a fence where he had been sitting and spoke to him. A short conversation was followed by a vicious and brutal assault on Carlstrom by both Gilhooly and Looney, the latter of whom was a smaller man than Gilhooly. They knocked Carlstrom down and savagely kicked him more than once, breaking his jaw. There were women passing on the other side of the street, who called out to these men to desist. "Never mind, lady," Gilhooly called back, "he is nothing but a God damned scab." He and Looney then turned through a vacant lot and ran away across it. Carlstrom, bruised and bleeding, started for his home and was met by his wife near the house and helped in. Physicians were called and examined him, and on their order he was taken to a hospital on that or the following day. There, on April 22nd, eight or nine days afterward, he was taken with pneumonia, of which, on April 27th, he died. His death under these circumstances made much stir, and on May 5, 1905, Gilhooly, Looney and Feeley were arrested on a charge of murder. On May 13th the plaintiffs in error, Casey and Newman, together with one George Miller (who was subsequently indicted as a party to the charged conspiracy, but as to whom the indictment was *nol prossed* during the trial),

were also arrested as accessories. Newman made a statement to the policemen who arrested him, and the police inspector before whom he was brought, concerning his own connection and that of others with a conspiracy or combination made on the night of April 7, 1905, by which Gilhooly and Looney and Feeley were hired by members of the Executive Board of Local No. 4 of the Carriage Workers Union to act as a slugging committee and beat various "scabs," whose names and addresses were given to them on the next day, April 8th, Meyers', or Carlstrom's name, being the first on the list. Then Mr. Meckel, who was taking a deep interest in the matter, was sent for and came with his lawyer, Mr. Heile, to the police station where Casey, Newman and Miller were confined, and in their presence, and in the presence of Casey, Newman repeated his statement. Casey also made a statement. Then George Miller told his story, claiming, however, that any part he took in the transactions involved was that of an innocent messenger. Gilhooly, Looney and Feeley were then brought in from another police station and confronted with Newman, Casey and Miller. Gilhooly, on being asked if he knew these men, answered "No," but they declared that Gilhooly was the man of whom they had been talking as a hired slugger. Gilhooly became violently angry and called them obscene names, declaring that if they had kept their mouths shut, nobody could have convicted him. Newman, after telling his story, also signed a written statement prepared by Heile, which statement was introduced at the trial as People's Exhibit 15.

Another statement was prepared by Heile for Casey to sign. Casey said that it was true, but declined to sign it without advice from his lawyer. This was introduced in evidence at the trial as People's Exhibit 18, limited by the court's rulings, as were Newman's statements and those of all the other defendants, as will be hereafter pointed out, to an effect upon the cases of some of the defendants only, against

which defendants they were respectively declared to be competent.

Sunday morning, May 14th, Novak and Heiden were arrested. Sunday afternoon Novak was interrogated by Heile and signed a statement prepared by Heile, which was introduced at the trial as People's Exhibit 16. It contains nothing but an alleged admission of Casey, and it was not admitted at the trial, except as against Novak, who was acquitted. About the same time, but separately (so far as Heile could testify) Mr. Heile interrogated Heiden and prepared a statement which Heiden signed and which was introduced in evidence as People's Exhibit 17.

May 15th another statement by question and answer was taken from Casey by Mr. Fake, assistant state's attorney, and Mr. Heile. It was taken down by a stenographer and introduced in evidence. On the same day a statement was taken in the same way by the same persons from Newman, which was introduced in evidence. Also one from Miller, in the absence of the other prisoners. Then Newman and Casey, being brought back and confronted with Miller, a conversation took place, which was also repeated in evidence at the trial. Feeley was then brought in and a conversation occurred in which a statement was made by him and taken down by the stenographer. It was offered in evidence, but was excluded as obtained after improper threats or pressure by the police inspector, and not therefore voluntary. Looney was then brought in and a conversation which then took place, in which Newman and Casey identified Looney as a man whom they had spoken of in their previous admissions, was at the trial offered and accepted in evidence. Looney himself denied everything with which he was charged.

Heiden was also again interviewed on May 15th by Fake, Heile and Meckel, and the officers, and a statement of what he said taken down in evidence. But

this was excluded from evidence as involuntary, after being partly read to the jury.

Deutsch was arrested on June 5, 1905, and on that day at the police station made a statement in the presence of Mr. Fake, Mr. Meckel, the police inspector and some other police officers. It was admitted in evidence.

Shields was arrested later on in May at Sterling, in Colorado, where he fled on hearing that he and his associates on the Executive Board of Local No. 4 were sought by the police. After he was brought back he was interviewed at the police station by Mr. Fake and police officers, but made no incriminating statements. On the trial he was a witness for the defendants, and denied any participation in any conspiracy as charged.

On the trial, by that evidence in the various statements above described, which was admitted as competent against the respective defendants, and by the testimony of George Meller, who, after pleading guilty, took the stand as a witness for the prosecution, the State undertook to prove, and did prove, to the satisfaction of the jury, a conspiracy connecting the plaintiffs in error, Newman, Casey, Heiden, Deutsch and Shields, with the assault on Carlstrom, which, as before set forth, several eye-witnesses produced at the trial saw Gilhooly and Looney commit.

Meller's testimony was to this effect: He had been, for thirteen years, in the employ of the Forbes Cartage Company in Chicago. He was elected president of Local No. 4 of the Carriage and Wagon Workers Union in September, 1902, and re-elected in December, 1903, and in May, 1903, serving until January, 1904, when Deutsch succeeded him and served six months, giving place to another man not involved in this prosecution. He was again elected president of the Union in January, 1905, serving until the latter part of April. April 7, 1905, Shields, Heiden, Deutsch, Mullen and Novak acted on the executive committee

of Local No. 4. That committee met at eight o'clock that evening at 55 North Clark street in Chicago. Meller presided. Casey at that time was business agent of the Local. Its financial secretary was Newman. Before going into the meeting of the Executive Board, Meller went into a saloon under the rooms of the Union. There he met Casey, who took him over to where three men were standing by the stove, and introduced him to them. The three men were Gilhooly, Looney and Feeley. Casey said to the three men, after introducing Meller, "You have got here, haven't you?" Meller excused himself and said he must go up stairs. Casey remarked, "I will bring that proposition up." Meller went up stairs into the room where the Executive Board met, and there closed the doors and called the board or committee to order. Shields, Heiden, Deutsch, Mullen and Novak were present. The regular order of business was taken up. The minutes of the last meeting were read, and then the secretary of the committee, Shields, began to read communications to the board. While he was doing so Newman and Casey came in, and Casey interrupted the proceedings by saying that he had a proposition to make. Meller told him to wait until the communications had been read, and then make it. The reading of the communications being finished, Meller called for Casey's proposition. Casey said, "I was standing at a street corner and a man accosted me and asked me was I Charles Casey, business agent of the Union, and I told him I was. He said, 'We have been doing work for the Wood Workers Union. We have been licking scabs and putting them out of business. You are known pretty well, and if the manufacturers see you they will have you arrested. We are in the business, a professional slugging committee.' I (Casey) told him that I had no right to hire anybody or make any deal with anybody at all, but that our Executive Committee was going to hold a meeting at 55 North Clark street at eight o'clock, and if you will come over I will

bring it before them and let you know what action they take." Casey continued, as Meller testified, by saying, "I was arrested myself for licking a man, and was fined ten dollars, and if we continue to pay fines, we won't be able to carry on this strike very long."

Meller testified that Shields then said, "I have met these fellows and they are all right, and I am in favor of hiring them." "I," Meller said, "asked how much money they wanted." "Casey said 'Of course they get big pay off the Woodworkers, but our Union is not in a position to pay them very much. I think that $50 will cover the bill.' I (Meller) said, fifty dollars for licking one man? Casey said 'Hell—no, they will lick about eight of them for that.' Then Heiden or Deutsch said, 'Other committees hire professional slugging committees, and I don't see why we cannot. One of our men has been paid by the Glassworkers to lick a non-Union man, and he got ten dollars for it.' Heiden asked how they were to know that the men had been licked. Casey said, 'Leave that to me and Gilhooly and the bunch, and we will see that they are licked all right.' Novak said there were men working at the Woods Motor Company who needed a good licking, and he was in favor of hiring this committee to give it to them. Then Shields said 'I make a motion that we hire this Slugging Committee.' I (Meller) put the motion and everybody said 'Aye.' Nobody said 'No,' and the motion was carried. Then Shields said, 'I make a motion that a voucher be made out for fifty dollars on the treasury and be left in the hands of Newman to be paid to this Slugging Committee when this work is done.' I (Meller) put the question again, and all said 'Aye.' An order on the treasurer of the Union, one Hensel, for fifty dollars to the order of Newman, was drawn and signed by me (Meller) as President. Newman put it in his pocket. Then I (Meller) asked Casey how many he thought ought to get a licking because they did not respond to the strike

call. Casey answered, 'There is one Christ Meyers, (the name Carlstrom was known by) working over to Meckel's place. When we had a talk with him he claimed that the Carriage and Wagon Workers Union had no jurisdiction over him, that he belonged to the telephone workers. That is the kind of a son of a bitch you want to get every time.' Then Casey went on naming other persons at different shops who had refused to come out. Meller told Newman to take the names of these men, and Newman took a book out of his pocket and wrote the names. Several names, including Meyers', were put on the list. Then Casey said, 'This Slugging Committee is down stairs, and we want to give them a kind of retainer; they ain't got a cent. We ought to give them a couple of dollars.' I (Meller) told Newman to give Casey two dollars, and Newman did so. Then I said 'Casey, see that the work is done and done right.' Casey went down stairs with the money and returned in about fifteen minutes and made a report about strike conditions in different shops. Then a deputation from the Woods Motor Vehicle Company Works came on some business before the Board. After hearing that deputation the meeting adjourned. Three or four days afterward, April 10th or 11th, Casey came to where I (Meller) was working, and I asked him if he had made arrangements with the Slugging Committee, to which Casey replied that he had. Among other things, Casey said: 'I go with them, and I point them out to the young fellow they call the dog, and he trails them up the first night and the next night· Gilhooly and the committee follows them up and gets them.' "

Meller testified also that on the 14th of April, at a regular meeting of the Executive Board at the same place, he again met with Casey, Newman, Novak, Heiden, Shields and Mullen. He called on Casey for his report as business agent, and Casey said, "We got one of·them men that was slated for a beating." Casey

had a clipping from a newspaper, stating that Union thugs had beat a man named Carlstrom. Casey said, "They have the name wrong; it was Meyers." Casey said, "I picked him out and showed him to the little dog, and they followed him to Princeton avenue, and Looney walked up and asked him, 'Why don't you be a good fellow and come out?' Meyers went to say something, and Gilhooly hit him a wallop in the jaw and knocked him down and Looney threw the boots into him, and said if it hadn't been for some women interfering they would have killed him." Meller then said before the Board, "There will be trouble, surer than hell, and you want to cut this out, this slugging business; this is going too far—a man's jaw broke and ribs and everything else." Then the Board went on with other business. The following day, Saturday, April 15th, Meller says that he met Newman and Casey in the saloon at 55 North Clark street under the Union Hall, and Casey said, "I have promised to meet the slugging committee over at Warren's saloon on Desplaines street. I promised to give them $15 and Newman only wants to give $11." Meller said to Newman, "You may just as well give him $15," and Newman assented and gave Casey $15, for which Casey signed a receipt. Then Meller offered to go with Casey to meet the slugging committee, and together they went to Warren's saloon at the corner of Desplaines and Monroe streets. There they met Gilhooly, Looney and Feeley. Casey said, "I am on time," and after several drinks gave Gilhooly $15, with the remark, "You certainly earned it." Gilhooly replied, "That son of a bitch that we threw the boots into yesterday won't report for work again for a few months. He won't bother you in this strike." Looney said that he threw the boots into Meyers, and he must have broken his ribs, because he nearly broke his own foot.

After Meller heard of Carlstrom's death he left the city and went to Cincinnati, from which, however, he returned in a few days and went to work in Chicago,

where he was arrested May 25th at his father's house and taken to jail.

It will be seen from the foregoing statement that the conviction of each of the plaintiffs in error, except that of Gilhooly and that of Looney, must rest on such evidence of Meller as is competent against said plaintiff in error, confirmed or corroborated, so far as it may be, by such evidence in his own statements, confessions or admissions as is competent against him, and such other evidence against him as is competent in the statements, confessions and admissions of his co-defendants.

Concerning Gilhooly and Looney, however, this is not the case, and in their case the contention that the verdict of the jury is against the weight of the evidence as to them may therefore well be disposed of first.

As to Charles Gilhooly: Independently of the testimony of Meller and of the statements termed confessions, there was evidence sufficient to convict Gilhooly of a conspiracy with other of the defendants to assault Carlstrom. In the first place, he was identified beyond all doubt as one of the persons who actually committed the murderous outrage. Eight eye-witnesses described the assault, and five of them identified Gilhooly as the principal actor. Of course it is true that he might have committed the assault without connection with a conspiracy entered into beforehand to do it, but when the manner of the sudden and apparently unprovoked attack and the contemptuous dismissal of expostulation with the assertion that the victim was only a "scab," are considered, it hardly needs the additional evidence given by his profane and obscene outburst at the police station when confronted with Casey and Newman, to show that the assault was a premeditated and prearranged affair, in which Gilhooly was the agent of others. That outburst not only showed that to be the case, but also indicated that Casey and Newman were among those others. "You are a fine lot to do anything with, make a mess of it,—get mixed up with a lot like you. If you fellows had kept your mouth shut

nobody could get the goods from me," were his ex-
clamations, mingled with curses and obscenity.

However, we are not confined to inference at all in
passing on the subject of Gilhooly's guilt, for still
abstaining from any reference to confessions or admis-
sions of alleged co-conspirators, and even from any-
thing said by them in furtherance of the common
purpose while the conspiracy was in progress, we find
in the testimony of Meller full warrant for finding Gil-
hooly guilty as charged. Casey introduced Gilhooly
to him at the saloon at 55 North Clark street on the
evening of April 7th, and talked before him of a propo-
sition he was going to bring up stairs in relation to
him. Casey went up stairs, and after getting a propo-
sition accepted, in which he named Gilhooly, took $2
with him, ostensibly to give Gilhooly, and disap-
peared below for a few minutes. Casey on April 14th
told Meller of the attack on Carlstrom, attributing it to
Gilhooly, and on the 15th Meller, after helping Casey
to get $15 from the treasurer of the Union for the
purpose, accompanied Casey to Warren's saloon on
Desplaines street, where the conversation hereinbefore
detailed took place between Gilhooly and the witness.

The only objection that can be made to the propo-
sition that this testimony is conclusive on Gilhooly's
guilt, is the doctrine, accurately and explicitly laid
down to the jury in the instructions, that the testimony
of an accomplice should be received and scrutinized
with great care and caution. But it is equally true,
and was with equal accuracy stated to the jury in the
instructions, that the testimony of an accomplice is for
the jury to pass on, and is not to be disregarded merely
because it is the testimony of an accomplice. Under
the law of this state a person may be lawfully convicted
upon the uncorroborated testimony of an accomplice
even. In the case of Gilhooly, the corroboration of
the testimony by which Meller connected him with a
conspiracy was extremely strong. The acts and
speeches of Gilhooly before, at the time of, and sub-

sequent to the assault itself, are exactly consistent with the truth of that testimony.

There can be no doubt that Gilhooly was convicted by the jury, on evidence amply sufficient, of participation from the lowest motives in a conspiracy which had for its object a murderous assault afterward carried out by him.

If he is to escape by this appeal from the consequences of that conviction, it must be on some technical ground, and not on any hypothesis of his possible innocence. Many such technical grounds are urged, and we will proceed to consider them *seriatim*.

1. The first concerns the impanelment of the grand jury. The contention is that the court erred in overruling a motion to quash the indictment because the record fails to show that the foreman of the grand jury was properly and separately sworn. The record states that "the grand jurors were duly sworn," and the Supreme Court has decided that this is sufficient. Bruen v. The People, 206 Ill. 417-424.

2. The next is this: Meller testified that Newman drew a voucher for $50 on the treasurer of Local No. 4, to be left in his hands, to hire "the slugging committee." Thereupon the state's attorney, in open court, called on Newman and his counsel to produce it. This, counsel for plaintiffs in error say, was flagrantly improper, both because no person can be compelled in any criminal case to give evidence against himself, and because, coming from an officer of the court, the question was tantamount to a declaration of his belief in the existence of the voucher and that it was in the possession of the defendant Newman or his counsel, and their failure to produce it would be regarded as a refusal to do so, and augment a prejudice already created against Newman and his co-defendants. It seems well to dispose of this contention here, as the argument of counsel affects Gilhooly's case as well as Newman's, although to a less degree.

We do not see how the prejudice complained of could

arise from this incident, even if the action of the state's attorney was unjustifiable. Counsel made it very apparent at once that they considered that the state's attorney was taking an unfair advantage, and the court's remarks showed that the only legitimate purpose of the demand was to lay the foundation for secondary evidence. But we may go further and say that we cannot see how the state's attorney's demand could be held erroneous. As the trial judge remarked, "counsel for defendants, when Meller spoke of the order, objected to his describing it because his testimony would not be the best evidence. Whereupon the state's attorney showed where it was last seen and called upon the person to whose possession it was traced to produce it, in order to make his secondary evidence admissible." The defendant addressed was not obliged and could not be compelled to produce it, and was not therefore called on to give evidence against himself. That the defendant, if he had the document, could, on the ground of possible self-incrimination, refuse to surrender it, does not make the notice superfluous or objectionable. 2 Wigmore on Evidence, sec. 1207; Attorney-General v. LeMerchant, 2 Term Reports, 201.

3. It is complained that the cross-examination of George Meller was unduly restricted. Meller was cross-examined by four different counsel—by some of them twice—and by all, as might be expected, rather rigorously. The relation of the witness to the conspiracy and to the defendants was fully investigated and shown to the jury. The questions affecting his family relations and his habits in connection with disreputable women, which on objection were ruled out, it was within the discretion of the trial judge to allow or disallow. We do not think his discretion was abused. He probably did not think their answers under the circumstances could have affected the result of the case, and we agree with him. His action was within the rules laid down in Cooper v. Randall, 59 Ill. 317, and Birmingham Fire Ins. Co. v. Pulver, 126 Ill. 329-340.

Shields v. The People.

4.  Even less meritorious is the criticism of the court's action in shutting out certain questions asked Inspector Lavin on cross-examination regarding his knowledge of the Employers' Association and its publications.  Answers to them could throw no light on the matter on trial.

5.  The controversy which arose over McPherson's cross-examination after he had been examined on the direct by counsel for Novak, who called him as a witness, seems to have arisen principally from the relations of the different defendants.  The court's rulings were not altogether consistent, perhaps, but the rule apparently laid down by it at first was that the cross-examination must be restricted to matters touched on in the direct examination by counsel for Novak, and that the fact that the state's attorney in cross-examination had touched on new matter did not give the counsel for the other defendants unlimited right to cross-examine on such new matter.  It did not adhere to this strictly, however.  We do not think there was error committed in this connection, but if there were, it certainly was not reversible error.  On the subject on which counsel complain cross-examination of McPherson was shut off, many witnesses were examined on direct examination by counsel for defendants, and among them McPherson himself.  (A clerical error in the abstract, corrected in the record, makes the name "McKinnon" on this second examination.)

6.  Nor can we see how the rulings of the trial judge in the cross-examination of Meckel and Officer Sheehan transcended his discretion.  We cannot see from the argument of counsel how the source of Meckel's first information or suspicions was material to the issue.

7.  It is argued that it was error to allow the widow of Carlstrom to testify how Carlstrom appeared immediately after the assault, what his subsequent condition of health was while at the hospital, and that he died two weeks after the assault.  Also that it was a similar error to allow medical testimony as to the same

matters and as to the results of the autopsy. Particularly it is claimed that it was objectionable to allow a section of Carlstrom's broken jaw bone, preserved in alcohol, to be shown to the jury.

On the part of the State it is said that the extent of the injury inflicted on Carlstrom was a circumstance proper for the jury to consider in determining whether there was a conspiracy and what punishment should be inflicted on the conspirators.

We think the State's position is well taken. If the assault had been merely a technical one, apparently designed to intimidate rather than injure, that fact we feel sure would have been competent and held competent to prove. If the assault had been the direct cause of death, instead of precedent to a disease, which frequently attacks the strong as well as the weak and injured, and which no earthly wisdom can therefore say with certainty was or was not in this case superinduced by the injury, it would have been competent to prove that. It was right to put the whole story of the alleged conspiracy and its development and results in evidence. If the conspiracy was proved, each conspirator was responsible legally and morally for the results. That certain of the plaintiffs in error may never have believed, and probably never did believe, that Gilhooly and his band would be guilty, in "licking a man," of the malignant brutality actually displayed, and still less expected or even feared that the "licked man" would die in a hospital two weeks afterward from a disease which it could never be proven would have attacked him except for an enfeebled condition resulting from the beating, does not ethically nor legally lessen their responsibility. It points, however, an obvious moral against meddling with unlawful methods of coercion to accomplish desired ends. As Meller says he told the Executive Board in this case, so in every such case, "There will be trouble surer than hell, and you want to cut this out, this slugging business."

8.   The contention is made as to Gilhooly, as well as in the case of the other plaintiffs in error, that confessions or statements of some of the alleged conspirators were admitted against others simply because these others were present when they were made.   Cases are cited to the points that after a prisoner is in custody the police have no right to ask him questions, and that an admission or confession so obtained is inadmissible, and that when a statement of one person is made or repeated in the presence of another, and that other is then asked by the police or prosecutors what he has to say to it, this is in the nature of an improper cross-examination of the second prisoner and neither the statement of the first prisoner made or repeated, nor the answer of the second, is admissible at their trials. But on the other hand it is asserted by the counsel for the People, who cite authorities in Illinois and in other States to support their proposition, that all conversations in which the accused participated, in which he was charged with the crime, are admissible, and that his silence even may be proven, although it furnishes but slight evidence of guilt.   It is not necessary to discuss these cases or to lay down any rule deduced from their comparison in treating of the case of Gilhooly.

Counsel complained of "sweat box" methods used by the prosecutor and the police in interrogating Gilhooly at the police station, and also of the method used in laying the history of the interview before the jury. The stenographic report of question and answer was read to the jury, and it is said that the state's attorney's questions contained assumptions of guilt, to which Gilhooly answered by denials.   Although a person was entirely innocent, the chances of his conviction would be overwhelming, counsel say, if questions to him relating to assumed facts and calling for categorical answer of "Yes" or "No" are allowed to be asked or repeated in the presence of the jury.

Sweat box methods are too frequently used in the

examination of prisoners. Statements are often pro-
cured from prisoners by the police by methods repug-
nant to principles of the criminal law, which, despite
some popular criticism, are just as salutary and neces-
sary now as ever they were. When statements are
so procured, public policy and the welfare of the
community demand that they should be rigorously
excluded at the trial, and for a failure of the
trial court to do so in any case—if the so-called
confession seemed material in securing conviction—
we should not hesitate to reverse a judgment. We
shall have occasion to discuss to some extent the
subject of the admissibility of confessions—what
should cause their exclusion and against whom and
under what conditions they may be received in con-
spiracy cases—as we proceed with the cases of other
plaintiffs in error here. But on the conviction of
Gilhooly it is not necessary to elaborate an opinion
on this question. In the first place, while we do not con-
sider it an ideal method of treating prisoners for police-
men or prosecutors to encourage prisoners to confes-
sions after their arrest, without warning them that
they are not obliged to incriminate themselves, that
they are entitled to counsel, and that anything they may
say may be used against them, and will not entitle them
to better or more lenient treatment while awaiting trial
or afterward, we cannot see that the contrary method
in the case of Gilhooly worked him any harm, and do
not agree with counsel that the assumptions of the
state's attorney in the questions could have prejudiced
the jury against him. Everything which was included
in these questions was practically sworn to by Miller
and other witnesses. To the questions, however, Gil-
hooly answered in categorical denial. This denial,
rather than the questions, was emphasized to the jury
by the reading.

Gilhooly's outburst of rage against Casey and New-
man was extorted by no threats nor brought about by
any persuasion. It seems to have been a result of that

ungovernable temper which dominated him in the assault because Carlstrom "put up a fight and broke his hat with a dinner pail." What he so voluntarily said in that rage was certainly admissible, and by it and the fact that Casey and Newman knew him by name and sight, and by the story of the assault itself, corroboration was furnished to the story of Meller which made it probable that any jury, without reference to the questions put to Gilhooly by Mr. Fake and his answers, and without reference to any statements of Casey or Newman, and despite the most careful warning against trusting too far to the statements of an accomplice, would have given that story credence as far as Gilhooly was concerned. It may be here remarked that taken together the instructions on this subject of confessions and their import and effect were fair and careful. The jury were told in the instructions asked for the People, that a confession made by one of several defendants jointly united for the commission of a criminal offence is binding upon any other of the defendants *if made in his presence and approved by him to the extent of his ratification or approval* (People's instruction 17), but in the instructions given at the request of the defendants they were told that the jury were not obliged to believe such statements to be free and voluntary because they were admitted in evidence, but were to consider the manner in which they were obtained as well as all the circumstances applicable to them, and if, under those circumstances, they deemed any of the statements therein unworthy of credit, they should disregard them. (Defts. Inst. 23.)

They were also told not to regard confessions or statements made by one defendant not in the presence of others as against such others, nor even if made in their presence because of silence, unless they were satisfied from the evidence that men similarly situated would, if innocent, naturally deny their guilt. They were told, in other words, that to justify them in con-

sidering anything said by others competent evidence against any defendant, they must believe from the evidence that said defendant did or said something inconsistent with his innocence, and that of this they were the judges. (Defts. Instructions 26, 28 and 30.)

By defendants' instruction 31 (incorrectly abstracted) and instruction 32, the jury are especially warned against regarding the confessions of others as affecting Gilhooly or Looney.

We think the law was correctly stated by these instructions considered together, and that Gilhooly has nothing to complain of in the admission of evidence against him which was incompetent, or in the instructions which were given as to what the jury should consider in determining his guilt.

9. If the conversations which the stenographer took down were competent at all, the manner in which they were presented to the jury did not render them incompetent. Counsel's objection that when the transcript was read, the stenographer was asked as to each question and answer whether they were correctly transcribed, instead of requiring his oath to the transcript as a whole, and reading it as a whole, seems hypercritical in a court of review. The net result was the same in setting before the jury the sworn report of the conversation and the mere matter of method was certainly within the discretion of the trial judge.

10. Complaint is also made by the plaintiffs in error in their argument (page 71, brief of plaintiffs in error) that evidence admitted by the court to apply only to Newman and to be incompetent as against him was nevertheless read into the record. The evidence alluded to was, in our opinion, immaterial, and could not have harmed any one of the defendants in error, and, as our Supreme Court has said often, in cases where the competent evidence clearly justifies the finding, error in the admission of certain incompetent evidence will not be ground for reversal. Dubois v. The People,

200 Ill. 157; Jackson v. The People, 126 Ill. 139; Williams v. The People, 166 Ill. 132.

In this case, however, reversal on the ground indicated by this objection would be particularly unjustifiable. On examination of the record, the reason for the court's remark—at first sight strange—"We must get it into the record somehow," referring to a question to Newman regarding one Beck and his answer thereto, is made clear. Objection had been made by one of the various counsel representing some of the defendants to a previous passage in the transcript of the conversation, and it had been ruled out. Thereupon counsel for certain other of the defendants insisted upon its being read into the record so far as his clients were concerned, saying, "I take it if we are going to take a man's statement, we ought to take it right along." Thereupon the court announced or at least adopted the rule of declaring incompetent testimony incompetent only as to those who objected to it, and he did so in regard to the particular question and answer objected to by counsel on page 71 of their brief and before referred to.

The fact that there were different counsel for different defendants should not be allowed to operate as a trap for the court to convict him of error, whichever way he might rule on the admission of evidence.

11.   The point is made by counsel for the plaintiffs in error that the proof is at variance with the indictment because the latter is of a conspiracy to assault Carlstrom, while the evidence, if it proves anything, is of a conspiracy to assault a whole class of people, namely, all who opposed the strike methods of Local No. 4. On the ground of this alleged variance the court below was asked to direct a verdict for the defendants, and we are asked to reverse the judgment as to all the plaintiffs in error. There is no merit in this contention. The evidence tended to prove a conspiracy to assault Carlstrom as the indictment charges. His

name was given to the "slugging committee." That
other names were given and that the conspiracy com-
prehended an intent to assault certain other persons
(not "a whole class") does not prevent its being a
conspiracy to assault Carlstrom. The greater includes
the less. As we said in Johnson v. People, 124 Ill.
App. 213, p. 221, defendants had a right to be fully ap-
prised of the nature of the charge against them, and a
concealment of the real nature of such charge by the
lack of obtainable precision in the indictment would
have been fatal. It is not this, but the very reverse—
too great precision—which is complained of here. We
agree with counsel for the People in the statement
"That persons who have conspired for the accomplish-
ment of several unlawful purposes, or for the ac-
complishment of an unlawful purpose by several un-
lawful means, cannot be indicted upon the charge of
conspiring to accomplish one of those purposes, or
of conspiring to accomplish the purposes by one of the
unlawful means, is a refinement of the proposition that
the purposes and means of a conspiracy must be
proved as laid in the indictment, which has no founda-
tion in reason." We may add that it has no more
foundation in authority. Veazie's Case, 7 Greenleaf
131; Commonwealth v. Meserve, 154 Mass. 64.

12. It is urged that the punishment is excessive.
The argument is this: The indictment charges a con-
spiracy to commit an assault and battery. Assault
and battery is an offense, the maximum punishment of
which is a fine of one hundred dollars. But on convic-
tion of a conspiracy to commit an assault and battery,
persons may be punished by the sentence of the jury
by imprisonment in the penitentiary for an indeter-
minate term not exceeding five years. This could not
have been intended by the Legislature, counsel say.
It could not have been intended, they insist, to make
it possible to punish people for a mere agreement to
commit an offense more severely than for the offense

itself.   To this point they cite cases like Hartmann v. Commonwealth, 5 Pa. St. 60, where the rule has been adopted that in an indictment under the common law for a common law conspiracy to commit an offense, a punishment severer than that provided for the offense cannot be inflicted.   As we pointed out, however, in Johnson v. The People, *supra*, the rule has no application to cases like the present.   "The statute has defined the offense of conspiracy for which this indictment was brought and determined the punishment within certain limits, and this is controlling.   The legislature indubitably possesses the power in its discretion to make the punishment for a conspiracy of two or more persons to commit a crime more severe than that of the crime itself."   And what we said further in that case we must repeat in this—that it does not seem to us that by the rule adopted by the legislature any principle of natural justice is violated.   Assault even without provocation may be, under many circumstances, a less heinous and odious crime, and, above all, a much less dangerous crime to society than a conspiracy to commit such an assault.   "The conspiracy shows premeditated wickedness and vindictive and inherent brutality, springing necessarily from malignant and abandoned hearts."   A combination of men to commit assaults upon peaceable citizens, by hired or selected thugs, is demoralizing, dangerous and subversive of both liberty and law in the community, to a degree that no sporadic assaults could be.

We are quite aware that the law concerning conspiracy as it stands on the statute book of Illinois, is one which affords opportunities for dangerous abuse, and agree with the apt language used by the learned judge of the Supreme Court in Michigan, in People v. Barkelow, 37 Michigan, 455, and quoted by counsel for the plaintiffs in error here.   "There is no class of cases," said the court in that case, in an opinion rendered by Judge Campbell, in which Chief Justice Cooley con-

curred, "where defendants are better entitled to the protection of the law against vague charges than when they are charged with conspiracy. The course of legal experience has shown this to have been a familiar resort to catch innocent persons by throwing a drag net of vague charges and resorting to suspicion and prejudice to induce juries to convict persons who find it impossible to escape the malicious insinuations of false accusers. Titus Oates' plot has been a warning to all courts and jurists not to encourage any looseness in charges which in exciting times juries and communities are only too ready to catch at to punish those who are unfortunate enough to be suspected."

But these considerations do not make a conspiracy to assault and beat people who are not thinking, speaking or acting according to the wishes of the conspirators a less dangerous crime, nor less deserving severe punishment if satisfactorily proved. Such conspiracies neither gain nor lose in danger or in justification by their being connected with strikes or labor troubles. They have been known in connection with religious disputes, with race questions, and with politics. At all times and under all circumstances they are equally malignant and criminal. It was for the jury to fix the punishment in this case, and we could not properly interfere with their judgment if we would.

13. It is next asserted that the judgment of the trial court sentencing plaintiffs in error to imprisonment in the penitentiary at Joliet without directing that while there they should be put at hard labor, is illegal and erroneous. We do not agree with this contention, which is based upon the position taken by counsel, that section 6 of division 14 of the Criminal Code, approved March 27, 1874, is not superseded by section 1 of the Acts approved June 15, 1895, June 10, 1897, and April 21, 1899, respectively, so far as the duty of the court to designate what portion of time the offender shall be confined to solitary imprisonment

and what portion to hard labor, goes. It is sufficient for us to say that we think that section 6, division 14, is so superseded in the case of all crimes mentioned in section 1 of the Act now in force concerning the sentence and parol of prisoners, approved April 21, 1899. That Act, in its final section, repeals all parts of laws not in harmony with its provisions. It certainly does not seem to us in harmony with a law which takes away from both court and jury the right to determine the duration of an imprisonment that the court should be obliged to say what portion of this indeterminate time should be spent in solitary imprisonment and what portion at hard labor. We think, moreover, that the Supreme Court has decided to this effect. People v. Murphy, 202 Ill. 493-496.

14. The final objection urged by counsel, which applies to Gilhooly, is that various instructions given were erroneous. The instructions were voluminous. There were forty-six given at the request of the People and thirty-nine at the request of the defendants— eighty-five in all. Taken together and read carefully they seem to us to fairly and fully present the law of the case to the jury.

We have given close attention to the criticisms made on the instructions by counsel for plaintiffs in error, and we are not convinced that any reversible error was committed in them when they are construed and compared one with another. As to all the vital points in the case, such as the caution with which the testimony of an accomplice is to be treated, as to the effect to be given to the confessions or statements alleged to have been made by various of the defendants, and as to the circumstances which make confessions voluntary or the reverse, we think that the trial judge used great and praiseworthy care that the defendants' rights should be protected by him and understood by the jury.

As we shall more particularly set out in the case of

Newman, we cannot agree with one portion or clause of instruction 22, asked by the People, but taken in connection with the facts and with other instructions, it could not have injured any of the prisoners, as we believe, and is not reversible error.

Complaint is made of instruction 15, but the argument is addressed rather to an attack on the method of policemen than to a challenge of the law as there laid down. We may agree with counsel, as we indicated that to some extent we do in the statement, that it is a matter in the discretion of the judge to admit or reject the answers to questions of officers to prisoners, and that the latter course should be adopted if there be reason to believe that a trap was being laid for the prisoner, without holding that instruction 15 was erroneous in this case. The judgment against Charles Gilhooly is affirmed.

As to Marcus Looney: From our discussion of the case of Gilhooly our conclusions as to Looney may easily be deduced. We see no reason upon the merits of the cause, or on the mere technical objections urged by counsel against the judgment, materially to differentiate his case from that of his associate in the assault. It is true he did not break into a rage with Casey and Newman and in that fit, by ill chosen words, corroborate the charges against him sworn to by Miller; and he was not identified by so many witnesses as was Gilhooly as one of the sluggers. But he was identified fully by one eye-witness and partially by another, and from all the evidence there is no reasonable doubt that he was one of the assaulting party and one of the conspirators who planned the assault.

There is, however, an error in the judgment in his case, not pointed out to us by his counsel in their arguments, but found by the court on inspection of the record and called by us to the attention of the state's attorney and of the counsel for plaintiffs in error.

The verdict of the jury as to Looney was this: "We, the jury, find the defendant, Marcus Looney, guilty of

conspiracy in manner and form as charged in the in-dictment, and we fix the punishment of the said defendant at imprisonment in the penitentiary.''

The judgment, however, adds to the usual form of sentence to the penitentiary the clause that ''It is further ordered that the said defendant, Marcus Looney, pay a fine in the sum of $1,000 and all the costs of these proceedings, taxed at $45.96, and that execution issue therefor.'' The words in the judgment, ''pay a fine in the sum of $1,000 and,'' are without any authority. How they became a part of the judgment is unknown to us, but they so stand in the record and in the transcript of it. Of course this is erroneous. Although it is not properly covered by any specific assignment of error, it is conceded by the state's attorney, to whose attention we called the matter, that we must find that the Criminal Court erred in assessing a fine against Looney, and we shall therefore hold the error properly cognizable by us under the concluding and general assignment. The state's attorney, however, insists that the judgment is erroneous and void only as to the fine or excess of punishment, and must otherwise stand, and has cited many apparently well-considered authorities to this effect. We have not been favored by counsel for plaintiff in error with any comments thereon, although they were invited by us. We think the position taken by the state's attorney is correct. There is a very full discussion of the matter in the note to the report of Re Taylor (7 South Dakota, 382), in 45 Lawyers Reports Annotated, and the conclusion reached from an examination of the cases there collated is expressed in Abbott's Trial Brief in Criminal Causes, page 751, by the proposition that in excessive sentences the legal or authorized portion of the sentence may stand, and the portion in excess be reversed. Other cases will there be found cited, as they will also in the note before referred to.

It seems to us a proper case for the exercise of power by this court to correct the judgment. That part of the judgment against Looney levying a fine against him of one thousand dollars, as expressed in the words above quoted from the judgment is therefore reversed, and the remainder of the judgment is in all respects affirmed.

As to Henry Newman: In the case of Henry Newman there is a point raised by his counsel which is not involved in the case of any other of the plaintiffs in error. He presented a petition for a change of venue, which was denied. This, it is vigorously insisted, was a denial to him of the right to a fair and impartial trial.

It is not denied by the plaintiffs in error that a wide discretion is given to a trial judge where there is a dispute about the matters of fact therein alleged in granting or denying such an application made on account of the alleged prejudice of the inhabitants of a county. He shall "grant or deny the petition as shall appear to be according to the right of the case," is the language of the statute. But it is said that it was in any event an abuse of discretion to refuse the application where there was no denial by counter affidavits, or other evidence of the allegations of the petition sworn to by Newman, nor of the "beliefs and fears" of many other persons that Newman could not have a fair trial in Cook county, set up in accompanying affidavits. And, further, that in the absence of such denial, it was the legal right of Newman to have the venue changed to another county, and not a matter for judicial determination.

It is true that in Price v. The People, 131 Ill. 223, and C. & A. R. R. Co. v. Harrington, 192 Ill. 16, it is only decided that in cases where counter affidavits are filed it is a matter of discretion for the court to grant or deny the application; but there is nothing in either case, or in any other we have been able to find in this state, which decides that it is not equally a matter

of discretion for the judge to pass on the sufficiency of the application in itself, and of the affidavits by which it is supported, and to weigh and consider them in connection with what he himself judicially knows of the development of the trial, of the situation of the case, and of the facts alluded to in the application. The language of the statute is certainly broad enough to imply that he has such a right. We think he has. In this case the order denying the change of venue in the bill of exceptions preserves the reasons given by the trial judge. He denies the petition, he says, "in view of what has taken place in open court in the examination of the jurors and the attitude of all of the defendants in consenting to a change, and the insufficiency of the petition and the time at which the application was made."

Nothing is preserved in the record regarding the examination of the veniremen, and this alone would prevent our holding, we think, that there was an abuse of discretion in this case. "The time at which the application was made"—after three weeks had already been consumed in an attempt to secure a jury—was certainly also a matter which might well have influenced the use of the court's discretion. We shall not disturb the judgment against Newman on account of this action of the court.

The case of Newman also differs from those of Gilhooly and Looney in that, as he was not present at the assault, no evidence directly connecting him with the alleged conspiracy exists, except that of Meller, who confessed himself an accomplice, and the statements or confessions which were admitted in evidence against him, notably and particularly his own. There were also admitted in evidence against him, however, under the rule alluded to in Gilhooly's case, certain conversations between Casey and others in his presence, in which he participated. Both by the instructions given to the jury, and by the sustaining of all

proper objections made by Newman's counsel to evidence offered of statements of his co-defendants, his rights, we think, were carefully protected by the court from being prejudiced by the statements of others than himself.

The real contention on the merits of Newman's case is that the testimony of Meller (which, if believed, was of course amply sufficient to justify the verdict found against him), corroborated by Newman's own statements, weighed against the legal presumption of his innocence, the testimony to his good character, and the testimony tending to discredit Meller should leave a sufficiently well-founded doubt in our minds as to his guilt to warrant reversal of his conviction. It is urged that this doubt ought to exist because the testimony of Meller is that of an accomplice, and the confession of Newman was not voluntary, but was induced by improper influences. It is sufficient, in passing on the weight of the evidence, to say that as a matter of fact we entertain no such doubt. The testimony of Meller, corroborated by the statement of Newman himself, taking into consideration all the circumstances under which it was made, convinces us that he was a component part of the conspiracy for which he was indicted. The testimony of Meller and its credibility was for the jury to consider. As we have already said, they were properly instructed as to the caution with which they should receive this testimony. But even without corroboration, they were at liberty if they chose, to believe it and convict on it alone.

Nevertheless, if the so-called confessions of Newman were so obtained as not to be legal evidence against him, their admission was an error important enough as to him to demand reversal. There were several admitted—one made by Newman to Inspector Lavin and other police officers on arrest; a practical repetition of this to Mr. Heile and Mr. Meckel later

the same day, and one taken down by a' stenographer
in the form of an interview between the state's at-
torney and Newman.   Besides there were statements
of Casey and remarks of Gilhooly made in the pres-
ence of Newman and admitted against him.   We do
not think, however, they were improperly admitted.

We have already stated what we think of sweat box
methods, but we do not find them shown by this rec-
ord.   We have very carefully read the testimony in
considering the actions of the trial judge in passing
on the various statements.   We think his rulings free .
from error and fair to the defendants, including New-
man.   In one particular of the instructions only we
disagree with him.   In the 22nd instruction given at
the request of the People, the jury were instructed
that even if the alleged confessions were obtained
from any defendant by the promise of a police officer
of some collateral benefit or boon, and that such police
officer carried out such promise, and such defendant
was benefited collaterally thereby, still, if no threat
or promise was made in reference to the crime
charged, in which such alleged confession was made,
then such confession was competent.

Counsel for the People have cited and quoted from
cases which sustain this proposition, but they are from
other jurisdictions and do not, as we believe, express
the law of this state.   The doctrine as stated is a dan-
gerous one—in its last analysis justifying torture and
bribery to secure confessions.   It should be qualified,
as it is in Greenleaf on Evidence, Vol. 1, p. 229, from
which it seems to have been originally adopted by the
courts which have used it.   There it appears in this
form:   "The confession will be received though it
were induced   *   *   *   by a promise of some col-
lateral benefit or boon, no hope or favor being held out
in respect to the criminal charge against him,   *   *   *
*provided* there is no reason to suppose that the induce-
ment held out was calculated to produce any untrue

confession, which is the manifest point to be considered.''

But the error, if it was an error thus to instruct the jury, was not fatal or reversible, first, because it was corrected by several other instructions which gave a correct view of the law, and by which they were told that they should not be influenced by any such alleged confession in the slightest degree, unless from all the evidence they were satisfied beyond a reasonable doubt that such alleged confession was freely and voluntarily made—notwithstanding such alleged confession had been received and allowed in evidence by the court; and, second, because there was nothing in this case to which to apply the proposition, in which it could have misled the jury. The only pretext of evidence that a collateral advantage was offered to any of the defendants from a confession, was that Newman was allowed to go with Mr. Meckel and an officer to see his wife, who was sick, after his statement to Inspector Lavin and the other policemen and to Mr. Heile and Mr. Meckel, but before his interview with Mr. Fake. But this was not proven to be in consideration of any statement. There is no evidence of any pressure, intimidation or threat shown in the record as to Newman's statements, nor of any privilege, immunity or benefit offered on account of them. The fact seems to be that Newman and Casey were stricken with genuine remorse and fear at what was then supposed to be a fatal ending to a plan which they had fully expected would involve only bruises and pain and temporary disfigurement on their victims, and were impelled by such fear and remorse to purely voluntary confessions.

All other questions arising in the case of Newman we have considered and disposed of in treating of the conviction of Gilhooly.

The judgment against Henry Newman is affirmed.

As to Charles Casey: There is nothing in the

case of Casey which requires special comment or distinguishes it from Newman's. He himself took the stand in an attempt to show that his statements or confessions were obtained by intimidation and pressure, but on cross-examination he stated that he was not threatened nor promised anything. The examination was before the court without the presence of the jury, and in the same connection the testimony of Heile, Meckel and the police officers, Lavin, Mahoney, Biddinger and Sheehan, was heard. We have carefully considered it all and agree with the trial judge in the conclusion that no threats or inducements were held out which rendered the statements inadmissible.

The judgment against Charles Casey is affirmed.

As to John Heiden: In the case of John Heiden the argument of counsel takes on a somewhat different emphasis and complexion, and the whole matter enters on another phase. Heiden, Deutsch and Shields, it is insisted by their counsel, have not been proven guilty by competent and sufficient testimony, whatever may be the case in regard to the other plaintiffs in error. This argument is based on the concession that Casey and Newman's confessions corroborated the detailed testimony of Meller on the stand as to their connection with the conspiracy. But Heiden and Deutsch's statements, it is said, did not so corroborate Meller in regard to themselves, and Shields made no statement.

Heiden was arrested on Sunday morning, May 14th. During the day, at some time in the afternoon, he was interviewed at the police station by Heile and Meckel, Inspector Lavin and some other policemen. Heile wrote down what he understood Heiden to have said, and Heiden signed it. This statement was introduced in evidence as People's Exhibit 17. It contained no admission of criminality. It stated, however, that he had been a member of the Executive Committee of Local No. 4 in the latter part of March

or the early part of April, 1905; that he was present at a meeting of the Executive Board when an appropriation was made by the committee for "an educational purpose;" that Casey came and said he could get an educational committee, and asked that $50 be appropriated for that purpose; that George Meller said, "Are there any objections?" and there were no objections. "I knew," the statement proceeds, "that an educational committee was to get members to strike, but I did not know in what manner."

Counsel for Heiden objected to the introduction of this statement on the ground that it was shown that Heiden had been drinking too much the night before, and that the statement was obtained, as they claimed Casey's and Newman's had been, by improper means. The trial judge decided that the statement was admissible, and we think decided rightly. Moreover, we think that with this statement in evidence it is not accurate to say that as to Heiden, Meller's testimony was without corroboration. The statement did corroborate Meller in a point most important—that a committee was hired for $50 at a meeting of the Executive Board, at about the time at which Meller stated, "to get members to strike," and that there was no objection made by any one present, and that Heiden was one of those present. We think that after these admissions, and the proved result of the "educational committee's" employment, the jury was justified, even though receiving the testimony of Meller with great caution, in believing that the testimony was true when it reported Heiden taking such part in the proceedings antecedent to the hiring of the "educational committee" and showing that he knew its real purpose and intended methods.

Heiden himself was placed on the stand and contradicted Meller, and said that when he referred to an "educational committee" in his statement to Heile, he understood it to be a committee which was to dis-

tribute Union literature. It was for the jury to judge of his credibility.

On May 15th Heiden was interviewed by Mr. Heile and questions and answers were taken down as in the case of Newman and Casey. But when the State attempted to introduce evidence of them, the trial judge, after a portion had been read and there had appeared a trace of what might be implied intimidation, excluded the statement *in toto*. Heiden complains of the partial reading of this statement, and his counsel say that although that which was read was stricken out, it was impossible to take from the minds of the jury the effect of the testimony although they were directed to disregard it. But he fails to show that his objections were not heeded as soon as made, and he did not, as he might have done—and as Casey and Newman did do—secure a hearing and ruling from the court as to the admissibility of the statement before any part of it was read to the jury. Nor do we see how anything therein contained and read could have injured him. The only material thing read not in Exhibit 17 was a further denial that he knew what an "educational committee" was on the night it was proposed, and that it was afterward only, that he found out that it involved "slapping people in the face or scaring them." Heiden himself, as we have said, took the stand and testified for himself, and we do not think the jury were misled by incompetent evidence in this regard. We feel compelled to affirm the judgment against John Heiden.

As to Charles Deutsch: Deutsch's case does not differ in any material respect from Heiden's. A colloquy between him and Mr. Fake, in the presence of Mr. Meckel and several policemen, on June 5, 1905, was taken down in shorthand and was introduced in evidence after a consideration of it and the circumstances under which it was made, apart from the jury. No evidence of improper pressure by either threats or promises was found by the trial court in it, and there

has not been any found by us. It denies criminality or knowledge of any criminal plot, but it was admissible, and it was for the jury to consider it all and determine whether it furnished or not corroboration of Meller's testimony. It admitted that there was a meeting of the Executive Committee on April 7th, that he (Deutsch) was present, that there was a discussion of the appropriation of $50, but, as he claimed, it was for picket work. He also admitted that during the conversation at the Board meeting Casey expressed his wish to get some money for men who were down stairs. If corroboration was needed of Meller's testimony to justify the conviction of Deutsch, it was for the jury to determine whether this statement of his and his own testimony when called as a witness in his own behalf did or did not furnish it. We are not, from anything that appears in this record, justified, as we think, in disturbing their decision. The judgment against Deutsch is therefore affirmed.

As to Edward Shields: Edward Shields was the secretary of the Union and of the Executive Board, and says himself that with Casey and Newman he had charge of the strike. The evidence, however, of his connection with the conspiracy charge is practically the testimony of Meller alone, but that is detailed and positive. Meller testified that Shields was in his seat at the meeting of the Executive Board on April 7th, when he (Meller) called it to order; that after Casey had made his report and proposition respecting the hiring of Gilhooly and his companions, Shields got up and said, "I met the fellows and they are all right, and I am in favor of hiring them;" that after the conversation which ensued, Shields made the motion that "this slugging committee be hired;" that he afterward made another motion "that a voucher be drawn for $50, and left in the hands of H. J. Newman to be used for hiring this slugging committee."

Shields testified in his own behalf and that of his co-defendants, and absolutely denied all this. He made

no admission or confession which could be said to tend to show his complicity in the crime charged, unless the admitted fact of his presence at the Board meeting of April 7th and his position as secretary of the Board are considered to be proof of it.

The State, however, contends that Meller's testimony in regard to Shields is corroborated and the case against him strengthened by two things—the disappearance of the record book of the minutes of the Executive Committee, of which he had charge as secretary, and his flight from Chicago to Colorado on May 15th, after he had learned from the papers of the arrest of other members of the Executive Board on a charge of being accessory to murder. Novak, testifying for himself in the defense, swore also that on April 12th Casey said to him and others who were picketing—; and he thinks Shields was among them—that "he (Casey) had a couple of men and he would see if he could induce some of these men to quit work," on which Novak warned him he might get into trouble. The jury were undoubtedly at liberty to consider all these matters, but we do not find in them any material corroboration of Meller's testimony so far as Shields' criminality is concerned. The fact that he had not the minute book in his possession, the leaving of the city that he might not be imprisoned on heavy bail, and the mere presence, if he were present, at Casey's remark to Novak, might all be entirely consistent with his innocence of the charged conspiracy, and the first two facts are naturally enough explained by him. We are practically left, therefore, in his case, as we have said, to the legal effect of Meller's testimony, which directly incriminates him. That that is to be treated with care and caution, as that of an accomplice, is a commonplace. The jury were so instructed. But for all that, it is the law of this State, at least, that a conviction may be had and sustained on the uncorroborated testimony of an accomplice. Under proper instructions, its truth or falsity is for the jury solely. Loehr v. People, 132

Ill. 504-514; Kelley v. People, 192 Ill. 119; Cross v. People, 47 Ill. 152; Gray v. People, 26 Ill. 344; Honselman v. People, 168 Ill. 172.    Moreover, that corroboration of such testimony is generally necessary to exclude a reasonable or well-founded doubt, does not, in our opinion, mean that as to each particular detail in the story of an accomplice, as affecting the guilt of all other persons charged with the offense—no credence should be given to it, if it stands alone, but that a tale which may, so far as the jury can tell, be made up out of the whole cloth by one who confesses that if it is true he is *particeps criminis* and an informer, is subject to great suspicion.    But if in material particulars, not affecting the guilt of some particular defendant, it has been corroborated, that may have a legitimate influence on the minds of the jury towards belief of the whole story.

It is insisted, however, that no verdict should be sustained on the testimony of Meller alone, because not only is Meller an accomplice, but he is so contradicted on material points by unimpeached and disinterested witnesses as necessarily to show to a reviewing court that he is unworthy of belief, and to leave in their minds such a well-founded doubt as necessitates reversal.    This contention is based partly on the specific denial of Shields, as well as of Heiden and Deutsch, that any of the proceedings alleged by Meller to have taken place at the meeting of the executive committee on the evening of April 7, 1905, actually took place, which denial is corroborated, it is said, by twelve disinterested persons who were then present.    It is also urged that Meller was discredited by his testimony, evidently disbelieved by the jury, that Novak was elected a member of the Executive Board before April 7th, and was present at the meeting of that date, and was also contradicted by overbalancing testimony as to other parts of his story; for example, as to the proceedings of the committee meeting on April 12th, and as to the conversation in Warren's saloon on April 15th.

Attention is also called to the fact that the records of the union show no voucher for $50 drawn on April 7th for the purpose of paying the slugging committee, as testified to by Meller, and that testimony impeaching Meller's character and showing him hostile to Shields was produced.

In view of these contentions we have very carefully gone over the record in all these matters, comparing and analyzing as well as we could all the evidence that therein appears. It would be useless to detail the process here. So far as the opposing testimony is of disinterested witnesses, the conflict seems to us more apparent than real—to be easily explained consistently with the truth of Meller's story. So far as it tends to impeach Meller's credibility, it was emphatically to be judged by the jury and the court which heard it. After a very thorough consideration of the whole matter, we cannot deem ourselves justified in setting aside the verdict or judgment against Shields, even convicted although he must have been mainly, if not entirely, by the reliance of the jury on Meller's testimony. The judgment against him is therefore affirmed.

To recapitulate, the judgments against Gilhooly, Newman, Casey, Heiden, Deutsch and Shields are each affirmed.

That against Looney is affirmed except that part of it which levies a fine against him of $1,000, which part alone is reversed.

*Affirmed in part and reversed in part.*