[Crim. No. 4557. In Bank. Nov. 17, 1944.]

THE PEOPLE, Respondent, v. DJORY NAGLE, Appellant.

[Crim. No. 4559. In Bank. Nov. 17, 1944.]

THE PEOPLE, Respondent, v. LUCILLE EYRE et al., Appellants.

Willard W. Shea, Public Defender for Appellants Nagle et al.

No appearance for Appellant Eyre.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

CARTER, J.—Defendants, Djory Nagle, Sally Mixon and Lucille Eyre were found guilty by a jury of the murder of John Lucia, a taxicab driver, whose death occurred as a result of bullet wounds suffered from a .32 automatic pistol owned by defendant Nagle and used by him in dispossessing Lucia of his taxicab. Sentence of death was imposed upon Nagle, while his codefendants were given life imprisonment. All three defendants have appealed from the judgments and from orders denying new trials. In addition to the automatic appeal from the judgment and sentence of death, counsel for appellant Nagle has diligently perfected and prosecuted an appeal on behalf of his client. The case has been ably briefed on behalf of defendants Nagle and Mixon, but no brief has been filed in support of the appeal of Lucille Eyre, however, we have examined the record for error on her behalf along with her codefendants.

The facts, as material to this appeal are that the three defendants at the time of the occurrence of the events herein concerned and for a short time prior thereto, had been residing at the home of defendant Lucille Eyre, an acquaintance of Sally Mixon, in San Francisco. Nagle and Eyre had for some time been discussing the carrying out of a holdup of a beer parlor in Oakland known as Sam's Place. Upon receiving and accepting on October 10, 1943, an invitation from Lucille's mother, a resident of Oakland, to pay her a visit the following day, the defendants decided to carry out the contemplated robbery of Sam's Place on the same trip. They planned to make a visit to Sam's Place, ''casing it,'' or looking it over early in the day and then carry out the robbery later. Nagle was the owner of a .32 caliber automatic revolver. Defendants had no automobile, but Sally was to borrow one from a friend in Oakland, as to which idea, she was apparently somewhat recalcitrant.

All of the defendants were habitual consumers of alcoholic beverages. According to the evidence, before starting out on the morning of October 11, 1943, they consumed a quantity of liquor. Shortly after leaving the house they stopped at a bar known as the ''Can Do,'' where Nagle drank gin, Sally, whiskey and beer, and Lucille, some form of liquor. They then procured a taxicab, which however because of regulations was unable to take them to Oakland, but took them to the Ferry Building, where decedent Lucia was engaged to transport them to Oakland. Before leaving however, another bar was visited and liquor consumed. They then were transported by Lucia to Sam's Place in Oakland, where they indulged in drinks while ''casing'' the place. While there, the idea originated (in whose mind does not appear), that Lucia's car, a large sedan would be good to use in perpetrating the robbery. It was agreed that Nagle should oust Lucia from the car in the neighborhood of Hayward. In consonance with this plan, upon resumption of travel, and after Lucia had been given $20 by Nagle for taxi fare, Sally requested that Lucia drive them to Hayward, stating she had a relative there. Upon reaching the outskirts of Hayward, Nagle, who was sitting in the front seat with Lucia, ousted the latter from the car. The evidence is conflicting as to just how this took place, but Lucia who was unarmed, was shot twice in the body and a third time, while lying on the ground, in the forehead. He was left to

die or dead alongside the road and defendants drove off toward Oakland in his automobile. During the melee with Lucia, Nagle got a considerable quantity of blood on his clothing, so in order to have at hand an alibi in case of need, he directed Sally to purchase some razor blades, and while at another bar in Oakland, cut himself on the left hand, quickly broke a beer glass against the bar, feigned cutting his hand, was taken by taxi to the emergency hospital where stitches were taken. He there gave the name of George Powell. The razor blade used was retrieved the next day from the toilet pipes in the women's rest room at the last-mentioned beer parlor. A bartender testified that Lucille went to the rest room right after Nagle cut his hand. Lucia's car had been abandoned upon reaching Oakland and the foregoing incidents necessitated the putting in abeyance of the plan to rob Sam's Place. After leaving the hospital defendants proceeded to the home of the mother of Lucille, where Nagle and Sally were arrested early the next morning at the instance of Lucille's mother, Lucille by this time having become semi-hysterical as a result of the lurid events of the preceding day. Later that same day, she also was taken into custody. Three days afterwards, Nagle and Sally made a joint statement to the district attorney's office which included among others, some of the foregoing details.

Three grounds are raised by appellants for reversal of the judgment. 1. That the court erred in denying appellants' motion made under section 995 of the Penal Code to set aside the information on the ground of the insufficiency of the evidence adduced at the preliminary examination to connect appellants with the death of John Lucia. 2. The joint statement of Djory Nagle and Sally Mixon was not freely and voluntarily given on the part of Djory Nagle and should not have been introduced into evidence. 3. The court erred in refusing to give defendants' proposed jury instruction in regard to intoxication.

 The evidence adduced at the preliminary examination was clearly sufficient to establish that a public offense had been committed, and there was reasonable or probable cause for appellants' commitment.

At the preliminary hearing the cause of the death of Lucia was established by Dr. Gertrude Moore, who performed an autopsy on his body. She testified that his death was due to

multiple bullet wounds. The prosecution then proceeded to assiduously trace the movements of defendants throughout the day of October 11, 1943. One Kief, a taxicab driver testified to his engagement by defendants and the driving of them to the Ferry Building. They wanted him to drive them to Oakland, but he could not do so because of regulations. Thomas Mooney, a service station operator, acquainted with deceased, testified as to the presence of defendants with deceased when the latter drove into Mooney's station between 1 and 2 p. m. Sam Matheson, proprietor of an Oakland café was then produced and identified defendants as being in his café, together with a man answering the description of Lucia, at about 3 p. m. on the same afternoon, and he testified that the four of them left together. They then placed upon the stand one Alvina Olivas who testified that on the afternoon of October 11, 1943, she was picking walnuts near Hayward, in close proximity to where the body of Lucia was later found; that a big dark car came along and stopped about 300 feet from her; that a man fell out, and another man got out of the car and pulled him over to the side of the road and left him there; that the car in driving away, passed her, and that there were two women in the car, one woman wore a green coat and had reddish hair. The latter statement of the witness was descriptive of the defendant Mixon and the coat she was wearing. Lillian Brill, working in her husband's liquor store at about 4 p. m. saw the defendants arrive in Oakland, hitting the curb as they drove up. She saw a blonde woman get out of the car wearing a coat like the one introduced into evidence as worn by defendant Eyre. In addition to the foregoing testimony, a .32 caliber bullet or projectile and shell case found near the body of Lucia and another bullet taken out of the back of the front cushion of Lucia's automobile were produced together with a .32 caliber automatic revolver taken from the handbag of defendant Mixon at the time of her arrest. The revolver was shown to have contained six cartridges, identical as to type and make, with the projectiles and shell case first mentioned. Decedent's car was shown to have been located in Oakland a few blocks from the place of defendants' arrest, and keys were produced accompanied by testimony that they fitted the locks on the car and had been found underneath a seat of the police car in which defendants Nagle and Mixon were taken to the police station after their arrest.

Defendants produced no evidence at the preliminary hearing.

It must be remembered that the evidence before a committing magistrate at a preliminary examination need not be such as would require a conviction. Section 872 of the Penal Code provides that the defendant must be held to answer if "it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof." Section 1487(7) of the Penal Code provides that a party is entitled to discharge upon habeas corpus proceedings where he has "been committed on a criminal charge without reasonable or probable cause"; "sufficient cause," therefore, means no more than that. (*People* v. *Putnam*, 20 Cal.2d 885 [129 P.2d 367]; *Cleugh* v. *Strakosch* (C.C.A. 9), 109 F.2d 330; *In re Martinez*, 36 Cal.App.2d 687 [98 P.2d 528].) "Reasonable or probable cause" means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. "Reasonable and probable cause" may exist although there may be some room for doubt. (*In re McCarty*, 140 Cal.App. 473, 474 [35 P.2d 568]; *Ex parte Heacock*, 8 Cal.App. 420 [97 P. 77]; *In re Mesquita*, 139 Cal.App. 91 [33 P.2d 459]; *Ex parte Vice*, 5 Cal.App. 153 [89 P. 983].) The committing magistrate, with the foregoing evidence before him had no alternative other than to order the defendants held for trial.

There was no error in receiving the joint statement of Djory Nagle and Sally Mixon.

It is appellant Nagle's contention that the joint statement given by himself and Sally Mixon to the district attorney's office, three days after their arrest, which included as a part thereof details of the robbery of Lucia's automobile and the shooting of Lucia by Nagle, was over objection improperly admitted into evidence, because it was not freely and voluntarily given on his part, but was compelled by his being held incommunicado three days, and more particularly, induced by a promise on the part of the jailers or others in authority, that "If I had something to say I would be permitted to see Miss Mixon; otherwise no." On the witness stand, he claimed to have been so far intoxicated that he could not recall the events surrounding the shooting and the removal of Lucia from his automobile.

The necessity for determining the voluntary character

of the statement does not depend upon whether or not it constitutes a confession of guilt. It included an important incriminating fact, that defendant Nagle fired the fatal shots. (*People* v. *Gonzales,* 24 Cal.2d 870 [151 P.2d 251]; *People* v. *Quan Gim Gow,* 23 Cal.App. 507, 512 [138 P. 918].)

■ At the outset the attorney general contends that any such inducement or promise of reward as claimed by appellant to have been made, assuming it was made, is not such a form of coercion or promise of reward as to require the exclusion of the confession. It has been held in some jurisdictions that a collateral benefit or boon, not relating to any phase of immunity, is insufficient to render a confession induced thereby inadmissible as involuntary. (*State* v. *Woo Dak San,* 35 N.M. 105 [290 P. 322]; *Roesel* v. *State,* 62 N.J.L. 216 [41 A. 408]; *Com.* v. *Knapp,* (Mass.) 9 Pick. 496 [20 Am.Dec. 491]; *State* v. *Tatro,* 50 Vt. 483; (promise to unchain defendant and allow him to associate with other prisoners; *Rex* v. *Lloyd,* 6 C. & P. 393 (promise to permit defendant to see his wife who was confined in a separate cell). (See 22 C.J.S. Criminal Law § 825, p. 1444; 16 C.J. Criminal Law § 1490.) However, aside from any constitutional violation, the circumstances surrounding the inducement or promised gratuity might be such as to render the confession equally untrustworthy, as if the inducement related to punishment. (*People* v. *Mellus,* 134 Cal.App. 219 [25 P.2d 237]; *Shields* v. *People,* 132 Ill.App. 109; *Com.* v. *Knapp, supra.*) We do not find it necessary, however, to pass upon the sufficiency of the alleged inducement as a matter of law, for the evidence clearly shows that the statement was freely and voluntarily given and free from any improper influence. A foundation for introduction of the statement was laid by the testimony of Christine Allen, a stenographer in the office of the district attorney, who was present and transcribed the whole conversation that took place between defendants Nagle, Mixon and the interviewing assistant district attorney, Laurence Dayton. She testified that at the time of the conversation no promises were made to either of said defendants to induce them to make a statement, but that it was freely and voluntarily given. This fact was also acknowledged by defendant Nagle in the statement, at which time he said to disregard all former statements made by him. In response to the admonition by Mr. Dayton that ''I want you to understand that all statements you now make you are making of your own free will, without any promise

by anyone,'' Nagle replied, ''Yes, I figure this: That is, if I make a statement now it's a confession and I know that is usually taken into consideration. I don't expect too much myself but there's always the possibility of a break for them.'' Nagle's testimony at the trial given upon *voir dire,* that the statement was induced by a promise to be accorded the privilege of seeing Miss Mixon was later contradicted by himself upon direct examination in chief, when he explained it away as having been made ''in order to let Miss Mixon out.'' Assistant District Attorney Laurence Dayton, called to the stand as a witness on behalf of defendant Nagle, denied sending word to him that he could talk to his codefendant Mixon if he would make a statement. The following colloquy appearing in the concluding portion of the statement is indicative that Nagle after having concluded same, had some hope that he would then be awarded the privilege of seeing his codefendant, which he then requested, but clearly shows that he was not acting in reliance upon any promise theretofore given: '' '(Nagle) I told you you should disregard everything I have told you before. I only hope you will take Sally into consideration; the girls, and especially Sally and go easy on her. I don't care especially about Lucille. Q. (Dayton) That's about the story. A. I believe that is about it. Will you make it possible for me to see Sally once or twice a week? Q. That is of course something that the Sheriff's office will have to arrange. A. But I suppose now, if you would suggest it, he might consider it, don't you think? Q. All right. That's about all now.' ''

As to Nagle's claim of being held incommunicado three days ensuing his arrest—up until the time of the giving of the statement, which is not relied upon as material, separate and apart from the inducement heretofore considered,—Nagle testified that he was held in a cell separate from other prisoners; but also that he was called out on various occasions, and that he did see and talk with Sally Mixon during that period. No showing was made that this treatment was unusual in respect to one in his position, or that he had cause to believe his treatment would be bettered if he confessed. What has heretofore been said in regard to the alleged inducement offered, applies equally upon the matter of the statement being affected by his treatment. The trial judge preliminarily admitted the statement and then submitted to the jury under proper instruc-

tions the question of its voluntariness, and their finding is amply supported by the circumstances before them.

 If the statement was made by defendant Nagle, upon the hope of being accorded the privilege of seeing Sally Mixon, or in an effort to free her and Lucille Eyre, yet it being a statement in the nature of a confession, voluntarily given, it could be used as evidence against him. (*People* v. *Luis,* 158 Cal. 185 [110 P. 580] ; *People* v. *Smalling,* 94 Cal. 112 [29 P. 421] ; *Reeder* v. *State,* 182 Ark. 1093 [34 S.W.2d 451].)

The jury was correctly instructed upon the issue of intoxication.

 It is contended by defendants Nagle and Mixon, that the court erred in refusing to give the following portion of a requested instruction to the jury: "If you find from the evidence that the defendant Nagle was so intoxicated on the afternoon of October 11, 1943, as to be incapable of forming an intent to rob John Lucia, then you will find the defendant Nagle not guilty of the crime of murder of the first degree." The jury was correctly instructed upon the bearing intoxication might have upon the existence of intent, to constitute a crime, by the giving of an instruction in the words of section 22 of the Penal Code, to wit: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." They were also instructed that it was incumbent upon the prosecution to show, "an intent to perpetrate the crime of robbery of John Lucia."

The portion of the instruction refused is cumulative and amounts at most to merely a direction to apply the law, as theretofore enunciated to defendants' situation, something the jury could not help from understanding they were to do anyway. There was no error in the refusal to so instruct. (*People* v. *Casagranda,* 43 Cal.App.2d 818, 822 [111 P.2d 672] ; *People* v. *Gaytan,* 38 Cal.App.2d 83 [100 P.2d 496].)

The judgments and the orders denying a new trial are and each of them is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.