RAFAEL FLORES MONTAÑEZ, Petitioner and Appellee, v. BAL-BINO GONZÁLEZ, Warden of the District Jail of San Juan, Puerto Rico, Respondent and Appellant.

No. 11562. Argued November 8, 1955.—Decided May 6, 1957.

*José Trías Monge, Attorney General,* and *Rafael L. Ydrach Yordán, Fiscal of the Supreme Court,* for appellant. *Augusto Burgos Mundo,* public defender, for appellee.

PER CURIAM.

Rafael Flores Montañez filed in the San Juan Part of the Superior Court a petition for a writ of habeas corpus. He alleged, briefly, that he was imprisoned by virtue of an order of one of the judges of that court for "the alleged crime of murder," for having taken the life of Víctor Carrasquillo Santos, and that his imprisonment was illegal because of lack of probable cause. The writ was issued. After the return as well as the answer of the Warden of the District Jail was presented, a hearing was held, at which the petitioner amended his petition alleging also that the bail was excessive, a contention which he abandoned later, and after urging that there was no proof of his having committed any offense, the lower court ordered his release. The People appealed from such order.

The People assigns two errors. In the first assignment it maintains that the evidence before the examining judge reveals facts and circumstances which warrant determination by the judge that there was probable cause for arresting Flores Montañez for the crime of murder, and, therefore,

that the lower court exceeded itself in the exercise of its authority in granting the petition for habeas corpus. We shall make an analysis of the evidence, which consists of the testimony of several witnesses, among them, petitioner himself, as well as of the certificate of autopsy, and then turn to the question of law raised by appellant.

Rafael Flores Montañez testified: "I have two sons, one three months short of 18 years old and the other 16 years old; I live with them and my wife on the farm of Víctor Carrasquillo Santos. This man, Víctor Carrasquillo, kept threatening my two sons, that he was going to smash their faces because they refused to make Nationalist propaganda. I came to see prosecuting attorney Gil to complain about it and he advised me to file a complaint. Yesterday, January 20, 1955, I swore a complaint against Víctor Carrasquillo for disturbing the peace. When I got back home, Víctor Carrasquillo renewed his insults and said to me: 'I learned that you had complained about me, you scoundrel, you coward; we will fix that up later.' This morning, while I was working with my sons on the farm, Víctor Carrasquillo showed up and threatened me and said to my son Nelson Flores Concepción: 'Get down from there, you thief; all of you are a bunch of thieves.' I then came down from the shed where I was working and told him not to speak like that, and as I said that Víctor Carrasquillo flung a machete at me; I grabbed the first club I could get hold of and struck him with it injuring him on the neck. Then, not knowing whether he was alive or dead, I came and surrendered myself to police officer Valdés."

Petitioner's two sons, Nelson and Gerardo Flores Concepción, also testified. The former stated that: "Today, January 21, 1955, at about 7:30 a.m., my mother called me to go and see Víctor Carrasquillo Santos, who was calling me to smash my face, and telling me not to be such a thief. I go up, put on my pants, and when I went out Víctor was

already on the hill beyond the house. As I went out I met my father who was coming home to make the list of groceries, and just then Víctor called us thieves. Then my father, Rafael Flores, asked him why he said that and Víctor Carrasquillo raised a machete which he was holding in his hands, which is this one which the prosecuting attorney is showing to me, and was about to hurl it at my father. At the same instant my father picked up a club from the *batey*, which is this one the prosecuting attorney is showing to me, and struck Víctor with it, and Víctor fell to the ground when my father struck him the second time because Víctor again attempted to strike him with the machete. That then I ran toward the house, because my mother has heart trouble, and I went to assist her, and when I came down Víctor was already dead. That then my father went back to put on a shirt and went over to the police headquarters of Río Piedras to surrender himself."

Gerardo Flores Concepción testified that: "Today, January 21, 1955, I was working with my father on the roof of a shed on the farm where we live, covering it with straw, and Víctor Carrasquillo arrived with a machete in his hand, calling my brother and all of us thieves and defying us. After we finished covering the roof, we came down from the shed and Víctor Carrasquillo came back, stopped a little farther from the shed, then returned and went down and stopped on the *batey* of my house uttering obscene words. My father then picked up a club and struck him injuring him on the head. He hurled the club at Víctor Carrasquillo because he swung the machete at my father but missed him; then my father picked up the club and struck him. Then my father, Rafael Flores Montañez, went to the police station to surrender himself. Víctor Carrasquillo was picked up and taken away. Víctor Carrasquillo kept calling us cowards, insulting us because one time he said that my brother and

I were grown-up men and that we could make propaganda to overthrow this government, and we refused to follow his advices."

It may be noted that Gerardo's testimony differs from that given by Nelson as to the blows which Flores Montañez inflicted on Carrasquillo. The former refers to one single blow; the latter to two blows, the blow which knocked down the deceased, and a second blow inflicted, as alleged by Nelson, under these circumstances: "Víctor fell to the ground when my father struck him the second time because Víctor again attempted to strike him with the machete."

Paulo Sánchez Rodríguez testified: "That today, January 21, 1955, at about 7 a.m., I was working on a shed owned by Rafael Flores in Barrio Morcelo of Río Piedras. That just then Víctor Carrasquillo Santos arrived carrying a machete, this one which the prosecuting attorney is showing to me, at the *batey* of Rafael Flores, and started to use obscene language such as this: 'These sons of a bitch; if I had known I wouldn't have brought you here, you thieves.' He went past the shed, stopped to think, then turned around and walked amidst those who were working in the tobacco shed where I was. That upon reaching the *batey* he said again: 'With this machete I could cut you all into pieces, even if you killed me, you bunch of thieves.' He meant us. Among us was Rafael Flores, who handed me the straw to cover the roof of the shed. That then Rafael Flores started toward the house to make the grocery list. That then I heard Rafael Flores say to him: 'Don Víctor, don't talk like that because I have some daughters' and Víctor answered: 'You are a bunch of *chamacos*.' That then the wife of Rafael Flores came up to the shed and said to me: 'Don Paulo, come here.' She said it crying and I thought something had happened in the house. I came down from the shed and found Víctor Carrasquillo lying dead under some guava trees in the *batey*. That then Rafael Flores said to me: 'Go on

with your work; I am going to town.' That Rafael Flores said to me: 'He flung the dagger at me and I had to defend myself. I struck him twice.' That's all I know."

The following appears in the certificate of autopsy: "Autopsy performed on . . . the corpse of Víctor Carrasquillo Santos in the Municipal Hospital of Río Piedras, P. R., on January 21, 1955, at 5:45 p.m. . . . An examination of the body lying on the autopsy table revealed that he was a white man, approximately 50 to 52 years of age, 55 inches tall, and weighing approximately 95 pounds. His beard and mustache were disheveled. He was wearing a very dirty white shirt and gray gabardine pants, also very dirty, and brown shoes with elastic. He was wrapped in a sack in the shape of a hammock. After taking off his outer garments, he was wearing white undershirt and shorts but no socks. After stripping him completely, first we examined the head, which presented a contusion with hematoma on the left parietal region and another contusion with hematoma on the right parietal region. He presents another contusion with hematoma on the central portion of the cranial cavity. He presents another contusion on the occipital region. He does not present contusions on the rest of the body. He presents a surgical wound on the left knee. This man was deformed; he was knock kneed, his left hip lower than the right one, and both feet very flat. His thorax was assymetrical.

"Upon opening the cranial cavity, we found a fracture of the left parietal bone and fracture of the occipital bone. He presented a blood clot in the middle cranial fossa. . . .

"*Cause of Death:* This man died from intracranial hemorrhage caused by fracture of the cavity and the base of the skull."

Andrés Cardona Carrasquillo, the deceased's nephew, testified on two occasions. He first testified that " . . . today, January 21, 1955, about 8:30 a.m., Rafael Flores Montañez, came to my house and asked me to go with him to police

headquarters in Río Piedras. When I asked him about it, he said: 'I killed the man.' I asked him what man, and he said: 'Víctor Carrasquillo Santos. . . .' " On the second occasion, January 24, he added that the petitioner told him that he had killed Carrasquillo Santos ". . . because I had to," without explaining how it had occurred, and that "Víctor Carrasquillo . . . was always around the farm carrying that machete."

The deceased's son also testified on the above-mentioned dates. In his first testimony he said: ". . . last night, January 20, 1955, at about eleven . . . my father, Víctor Carrasquillo, and Nelson Flores engaged in an argument about some lemons which Nelson stole from my father. After the argument we went to bed and next morning, that is, today . . . my father went out as usual to take the calf to the farm, carrying a machete in his hands as he always did. That later I left for school, and while there they came for me because my father was dead." On January 24, he further testified that his father had urged Nelson not to take the lemons because they were green, but that "Nelson took them just the same." He also testified that in the morning of the events, after Carrasquillo Santos "milked the cows, he went up the hill where Rafael Flores Montañez lives taking the calf with him and also the machete" which "he always carried with him"; that "after my father left with the calf and the machete in the direction of Flores Montañez's house, I left for school. . . ."

Justo E. Quiñones, Commonwealth Police lieutenant, testified: "That on January 21, 1955, at about 8:45 a.m., Rafael Flores Montañez came to this station accompanied by Andrés Cardona Carrasquillo. He informed . . . that in the Barrio Morcelo, where he lives, he had been assailed with a machete by Víctor Carrasquillo Santos and that he struck him with a club in self-defense and believed that he had killed him. I visited the scene of the crime . . . The body

of Víctor Carrasquillo Santos was lying in front of Flores Montañez's house. This machete, which we seized and turned over to the prosecuting attorney for investigation, was lying close to the body next to his right hand. The club which we also turned over to the prosecuting attorney, with which Rafael Flores Montañez injured Víctor Carrasquillo Santos, was also lying near the body of Víctor Carrasquillo. The police photographer took pictures of the scene." They appear in the record. Four of them show the body of the deceased.

The lower court held that the evidence showed that Flores Montañez had killed Carrasquillo Santos in self-defense, having therefore reached the conclusion that there was no probable cause for his arrest.

 Time and again this Court has said that a habeas corpus proceeding, in which petitioner maintains that he is incarcerated by virtue of a court order to answer for an offense, without probable cause therefor, does not lie to determine his innocence or guilt, which is a question to be considered and decided only within an ordinary trial, *Benítez v. Calzada*, 34 P.R.R. 514; *Ex parte Ferrá*, 61 P.R.R. 389; *Ex parte Mercado*, 63 P.R.R. 877; and that the only question to be determined is whether there is probable cause for his detention if he fails to give the required bail.

 To these rules we now wish to add that, in order to dispose of that question, the court taking cognizance of the proceeding has authority to examine the evidence before the committing judge with a view to determining whether there was any competent evidence to warrant the finding of probable cause to believe that the petitioner committed the offense for which he was imprisoned, *Fernández v. Phillips*, 268 U.S. 311; *Ex parte Vandiveer*, 88 Pac. 993 (Cal.); *Ex parte Driggs*, 102 Pac. 542 (Cal.); *Ex parte McCarty*, 35 P. 2d 568 (Cal.); *State v. Ross*, 170 N.W. 121 (N.D.);

*State* v. *Fischer*, 298 N.W. 353 (Wis.),[1] if it appears that no such evidence was presented, the arrest is not warranted; but if it appears, on the contrary, that there was evidence for the magistrate to act upon in determining the existence of probable cause to believe that petitioner was guilty, habeas corpus does not issue and the writ should be discharged, *Ex parte Becker*, 25 Pac. 9 (Cal.) ; *State* v. *Fischer, supra; Arnold* v. *Schmidt*, 143 N.W. 1055 (Wis.); *State* v. *Baeverstad*, 97 N.W. 548 (N.D.); *State* v. *Sievers*, 168 N.W. 99 (Neb.); *Ex parte Jones*, 96 Fed. 200. [3] That evidence—which is sufficient to support such determination and to order the incarceration of a person awaiting trial if no bail is given, for the purpose of guaranteeing his appearance at the trial to be tried according to law—need not be such as is required for conviction. It need not show his guilt beyond a reasonable doubt, *United States* v. *Burr*, 25 Fed. Cas 2; *Fernández* v. *Phillips, supra; Ex parte Jones, supra; Ex parte Vandiveer, supra; People* v. *O'Brien*, 100 P. 2d 367 (Cal.) ; *People* v. *Mitchell*, 157 P. 2d 862 (Cal.) ; *People* v. *Nagle*, 153 P. 2d 344 (Cal.) ; *People* v. *Mc Rae*, 187 P. 2d 741 (Cal.) ; *People* v. *Tallman*, 163 P. 2d 857 (Cal.), a requirement of proof which is applicable to the trial and not to the process of determining whether or not probable cause exists to order an arrest. [4] The ex-

---

[1] In *Ex parte Vandiveer, supra*, the court stated as follows: "The utmost power given us is to say whether or not there is some evidence which would reasonably justify the magistrate in finding that probable cause appeared that the offense was committed by the person charged." And in *Ex parte Driggs, supra*, the court said: "In applications for writs of this character [habeas corpus], we will not enter into an examination of the record with a view of determining whether or not the testimony, in our opinion, warrants the commitment, but rather into an examination . . . to determine whether or not there was testimony from which the examining magistrate was warranted in acting. In other words, is there evidence in the record tending to show the commission of an offense and petitioner's criminal connection therewith, from which may be inferred a reasonable probability of the petitioner's guilt?"

amining judge may determine that it does exist, notwithstanding there is some room for doubt as to the guilt of the defendant ordered to be committed, *People* v. *Nagle, supra; Ex parte McCarty, supra; People* v. *McRae, supra,* and other precedents cited. This rule could not be better illustrated than by quoting the words of Mr. Chief Justice Marshall in *United States* v. *Burr, supra,* on the rules governing the determination of probable cause to order the commitment of a person to answer for the commission of an offense, as follows: "On an application of this kind I certainly should not require that proof which would be necessary to convict the person to be committed, on a trial in chief; nor should I even require that which should absolutely convince my own mind of the guilt of the accused: but I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it."

██ Under the rules noted, and for the limited purposes of finding probable cause for arrest—which should not be understood nor considered in any manner whatever, at a trial, as suggestive of the guilt of the defendant, upon determining that probable cause exists, nor of his definitive exoneration, upon determining that it does not exist—the evidence presented to the judge who found that probable cause did exist for the arrest of petitioner contains, in our opinion, sufficient elements to support such determination; a conclusion which has nothing to do with the sufficiency of the evidence required for a conviction, a problem on which we do not express, nor could express, any view whatever, because it is wholly outside the orbit of a habeas corpus proceeding such as the present one. Whether or not the evidence appearing in the record is sufficient to convict Flo-

res Montañez, is a question to be decided pursuant to the legal rules governing trials by the court or by the jury who shall decide whether he is innocent or guilty.

In view of the fact that the prosecuting attorney has already filed his information, which he could have done at any time he deemed it justified, independently of the results of this proceeding, *People* v. *Superior Court*, 75 P.R.R. 501 (1953),[2] and that the petitioner will be prosecuted at a trial, we do not find it proper to analyze here the evidence before the committing judge in order to avoid that the conclusion of this Court, which is confined exclusively to the question of probable cause for the purpose of the arrest, be given a different scope than the one it actually has.

In the second assignment appellant maintains that the lower court erred "in granting the . . . habeas corpus and releasing Rafael Flores Montañez, in disregard of the pro-

---

[2] In the case of *People* v. *Superior Court, supra,* we said the following: "The prosecuting attorney shall submit to the magistrate evidence of probable cause of the commission of a public offense by oath or affirmation which might lead the magistrate to believe that defendant has committed the offense charged, a hearing being unnecessary in such case. *Cf. Guadalupe* v. *Bravo, Warden,* 71 P.R.R. 913. Although the prosecuting attorney is at present without power to issue warrants of arrest or to fix and accept bail, he still has power to file informations if 'he solemnly believes there exists just cause for the filing of this information'—§ § 3, 72, 95, and 98 of the Code of Criminal Procedure—since the constitutional provision under consideration does not purport to limit such power."

The following appears at pp. 67 and 68 of the Transcript of Evidence:

"The petition for habeas corpus is granted and the discharge of the defendant is ordered.

Is the information ready? File it right away.

Prosecuting Attorney: No, your Honor, I do not believe I ought to do it now.

Judge: You must do it before the 24th of this month.

Prosecuting Attorney: We will do it as soon as it is deemed opportune. The prosecution will bring the case to court by means of an information, as an exclusive power of the prosecution.

Judge: No one can compel you, nor prevent it."

visions of § 55 of our Penal Code." [3] In view of our holding, we need not discuss this error.

The order appealed from is reversed and, consequently, the petitioner will be returned to the custody of the defendant warden.

Mr. Justice Marrero did not participate herein.

Mr. Justice Negrón Fernández dissented.

---

[3] Section 55 of our Penal Code reads as follows: "The question whether a homicide was committed in self-defense is a matter to be submitted to the court or jury."