Los Jueces Asociados Sres. Sifre y Belaval no intervinieron.

RAFAEL FLORES MONTAÑEZ, peticionario y apelado, *v.* BALBINO GONZÁLEZ, Alcaide de Cárcel de Distrito de San Juan, Puerto Rico, recurrido y apelante.

Número 11562.

*Sometido:* 8 de noviembre de 1955. *Resuelto:* 6 de mayo de 1957.

---

940

*Hon. Secretario de Justicia José Trías Monge y Rafael L. Ydrach Yordán, Fiscal del Tribunal Supremo,* abogados del apelante; *Augusto Burgos Mundo,* defensor público, abogado del apelado.

*PER CURIAM:* Rafael Flores Montañez presentó una petición en el Tribunal Superior, Sala de San Juan, solicitando un auto de hábeas corpus. Alegó en síntesis, que se encontraba detenido en virtud de orden de uno de los magistrados de dicho tribunal, por "el supuesto delito de Asesinato", cometido al privar de la vida a Víctor Carrasquillo Santos, y que la

detención era ilegal por haber sido decretada sin mediar causa probable. El auto fué expedido. Presentado el *return*, así como la contestación del Alcaide de la Cárcel de Distrito de San Juan, y visto el recurso, en cuya ocasión el peticionario enmendó su petición alegando también que la fianza era excesiva, contención que abandonó más tarde, sosteniendo que no había prueba de que hubiera cometido delito alguno, la corte a quo resolvió que el peticionario debía ser excarcelado. De esa resolución apeló El Pueblo.

Apunta dos errores. Sostiene en el primer señalamiento que la prueba presentada al juez instructor revela hechos y circunstancias que justifican la determinación de dicho magistrado de que había causa probable para arrestar a Flores Montañez por el delito de asesinato, y que por esa razón el tribunal de instancia se excedió en el ejercicio de su autoridad al declarar con lugar la petición de hábeas corpus. Haremos una relación de dicha prueba, que consta de declaraciones prestadas por varios testigos, entre ellos, por el propio peticionario, así como de un certificado de autopsia, para después referirnos a la cuestión de derecho planteada por el apelante.

Rafael Flores Montañez declaró: "Yo tengo dos hijos, uno de 18 años menos tres meses y el otro tiene 16 años, y vivo con ellos y mi esposa en la finca de Víctor Carrasquillo Santos. Este hombre, Víctor Carrasquillo, se pasaba amenazándome a los dos hijos que les iba a partir la cara porque mis hijos se negaban a hacer propaganda nacionalista. Yo vine donde el Fiscal Gil y le dí la queja y el Fiscal Gil me dijo que lo denunciara. Ayer 20 de enero de 1955, yo juré una denuncia por Alterar la Paz contra Víctor Carrasquillo. Cuando yo llegué a mi casa, me salió Víctor Carrasquillo insultándome y me dijo: 'supe que me habías denunciado canto de chulo, cobarde, que eso lo arreglamos más tarde'. Esta mañana, estando trabajando mis hijos y yo en la finca, vino Víctor Carrasquillo y me amenazó y le dijo a mi hijo, Nelson Flores Concepción: 'Apéate de ahí, canto de ladrón, todos ustedes son unos ladrones'. Entonces yo me bajé del rancho

donde estaba trabajando y le dije que no hablara así y cuando yo le dije así, Víctor Carrasquillo me tiró con un machete, y yo cogí el primer palo que encontré y le pegué con él y le cogí en el cuello. Entonces, sin saber si estaba vivo o muerto, vine y me entregué al Policía Valdés".

También declararon los dos hijos del peticionario, Nelson y Gerardo Flores Concepción. El primero expuso que: "en el día de hoy, 21 de enero de 1955, a eso de las siete y media de la mañana, mi mamá me llamó para que fuera donde Víctor Carrasquillo Santos quien me estaba llamando para partirme la cara, y no fuera tan pillo. Me levanté y me puse los pantalones y cuando salí ya Víctor estaba en un montecito más arriba de casa. Al bajar, mi papá venía para casa a hacer la nota de la tienda, y en esos momentos Víctor dijo que nosotros éramos unos pillos. Que entonces papá, Rafael Flores, le dijo que porqué decía eso y Víctor Carrasquillo Santos levantó un machete que tenía en las manos, y que es éste que me muestra el fiscal, y le fué a tirar a mi papá. Que en esos momentos mi papá cogió un palo que había en el batey, que es éste que me muestra el Fiscal, y le dió con un palo, con él, a Víctor y Víctor cayó al suelo, cuando papá le repitió un segundo palo porque Víctor trató de darle con el machete nuevamente. Que entonces yo cogí para mi casa porque mi mamá padece del corazón y me fuí a aguantarla y cuando bajé ya Víctor estaba muerto. Que entonces mi papá se fué a poner una camisa y se fué a entregar al Cuartel del Pueblo de Río Piedras".

Gerardo Flores Concepción testificó que: "hoy día 21 de enero de 1955, yo estaba con mi papá encima de un rancho de la finca donde nosotros vivimos, tirando paja sobre el rancho y llegó Víctor Carrasquillo tratando de pillos a mi hermano y a todos nosotros con un machete y desafiándonos. Después que acabamos de echar la paja bajamos del rancho y entonces volvió Víctor Carrasquillo y se detuvo un poco más arriba del rancho y volvió y bajó y se paró en el batey de casa a hablar malo. Entonces papi cogió un palo y le metió

un palo y lo cogió por la cabeza. Papi le tiró con el palo, porque Víctor Carrasquillo le tiró un machetazo, pero no lo cogió y entonces papi cogió el palo y le pegó. Entonces mi papá, Rafael Flores Montañez, se fué a entregar a la policía. A Víctor Carrasquillo lo recogieron y se lo llevaron. Víctor Carrasquillo se pasaba diciéndonos cobardes e insultándonos, porque una vez él nos dijo que ya mi hermano y yo éramos hombres y que podíamos dedicarnos a hacer propaganda para derrotar este gobierno, y nosotros nos negamos a seguir sus consejos".

Como se habrá notado, la declaración de Gerardo difiere de la prestada por Nelson en cuanto a los golpes que dió Flores Montañez a Carrasquillo. El primero se refiere a un sólo golpe. El último a dos, al que derribó al occiso, y al segundo, propinado según Nelson, bajo estas circunstancias: "Víctor cayó al suelo, cuando papá le repitió un segundo palo porque Víctor trató de darle con el machete nuevamente."

Paulo Sánchez Rodríguez depuso: "Que en el día de hoy 21 de enero de 1955, a eso de las siete de la mañana, me encontraba yo trabajando en un rancho, propiedad de Rafael Flores, en el Bo. Morcelo, de Río Piedras. Que en esos momentos llegó Víctor Carrasquillo Santos, con machete en mano, éste que me muestra el fiscal, al batey de Rafael Flores, y se puso a hablar malo, pronunciando tales palabras como: 'Estos canto hijo de la gran puta, si yo sé no los hubiera metido aquí. Pillos'. Subió más arriba del rancho y pensó un poquito y luego viró, pasando por entre medio de los que estaban trabajando en el rancho de tabaco donde estaba yo. Que al llegar al batey nuevamente dijo: 'Con este machete me atrevía yo entrarle a tajos a todos ustedes, aunque me mataran, canto de pícaros'. Se refería a nosotros. Entre nosotros estaba Rafael Flores, quien me daba pajas para cubrir el techo del rancho. Que entonces Rafael Flores salió para la casa para hacer el vale de la compra de la casa. Que entonces oí que don Rafael Flores le dijo: 'Don Víctor, no hable así que aquí yo tengo hijas'. Y Víctor le contestó:

'Ustedes son unos chamacos'. Que entonces la señora de Rafael Flores llegó hasta el rancho y me dijo: 'Don Paulo, venga acá'. Me lo dijo llorando y creí que había pasado algo en la casa. Me tiré rancho abajo y me encontré con Víctor Carrasquillo Santos tirado en unos guayabos, en el batey, muerto. Que entonces don Rafael Flores me dijo: 'Siga su trabajo, que yo voy al pueblo'. Que don Rafael Flores me dijo: 'Me tiró con la daga y yo no me iba a dejar dar. Le metí dos palos'. Que es cuanto yo sé".

Lo siguiente consta en el certificado de autopsia: "Autopsia practicada . . . . . . . . . . . . . . . . . . . . . al cadáver de Víctor Carrasquillo Santos en el Hospital Municipal de Río Piedras, P. R. hoy día 21 de enero de 1955 a las 5:45 P.M. . . . . A la inspección encontramos sobre la mesa de autopsias cadáver de hombre blanco de aproximadamente 50–52 años de edad, que mide cincuenta y cinco pulgadas de estatura y pesa aproximadamente 95 libras. Tiene barba y bigote desaliñado. Usaba camisa blanca muy sucia y pantalón de gabardina gris también muy sucio, y zapatos *brown* con elástico. Venía envuelto en un saco y en forma de hamaca. Una vez le quitamos la ropa exterior encontramos usaba camiseta blanca y pantaloncillos blancos y no usaba medias. Una vez desnudo por completo, empezamos la inspección de la cabeza encontrando presenta contusión con hematoma en la región parietal izquierda, presenta otra contusión con hematoma en la región parietal derecha. Presenta otra contusión con hematoma en la parte central de la bóveda craneana. Presenta otra contusión en la región occipital. No presenta contusiones en el resto del cuerpo. Presenta una herida quirúrgica sobre la rodilla izquierda. Este hombre era deforme, teniendo ambas rodillas juntas, la cadera izquierda más baja que la derecha y ambos pies muy planos. Su tórax era asimétrico . . . . .

"Abierta la cavidad craneana encontramos fractura del parietal izquierdo y fractura del hueso occipital. Presentaba coágulo sanguíneo en la fosa cerebelosa media . . . . .
. . . . . . . . . . . . . . . .

"*Causa de la Muerte:* Este hombre murió de la hemorragia intracraneana por la fractura de la bóveda y la base del cráneo."

Andrés Cardona Carrasquillo, sobrino del occiso, testificó en dos ocasiones. En la primera manifestó que ". . . en el día de hoy, 21 de enero de 1955, a eso de las ocho y media de la mañana estuvo a casa a buscarme Rafael Flores Montañez, para que lo acompañara al Cuartel de la Policía de Río Piedras. A preguntas mías me dijo: 'Yo maté al hombre'. Le pregunté qué hombre y me dijo 'Víctor Carrasquillo Santos . . .' ". En la segunda ocasión, en 24 de enero, añadió que el peticionario le informó que había dado muerte a Carrasquillo Santos ". . . porque me costó", sin que le explicara cómo había ocurrido el hecho, y que "Víctor Carrasquillo . . . siempre andaba por la finca con ese machete".

El hijo del interfecto también depuso en las fechas arriba mencionadas. En su primera declaración dijo que: ". . . anoche 20 de enero de 1955 como a las once . . . , mi papá Víctor Carrasquillo y Nelson Flores tuvieron una discusión por unos limones que Nelson le cogió a mi papá. Terminó la discusión y nos acostamos y al otro día por la mañana, o sea, hoy . . . , como de costumbre mi papá salió a llevar un becerro para la finca y llevaba un machete en las manos, que él siempre acostumbraba llevar. Que más tarde me fuí para la escuela y estando en la escuela me fueron a buscar porque mi papá estaba muerto". En 24 de enero, amplió su testimonio, diciendo que su padre le manifestó a Nelson que no cogiera los limones porque estaban verdes, pero que "Nelson siempre se los llevó". Además expuso que en la mañana de los sucesos, después que Carrasquillo Santos "ordeñó las vacas, subió en dirección al cerro donde vive Rafael Flores Montañez, a llevar un becerro y llevaba también un machete en las manos", con el que "siempre andaba"; que "Cuando mi papá subió con el becerro y el machete en dirección a la casa de Flores Montañez, yo me fuí para la escuela . . .".

Justo E. Quiñones, Teniente de la Policía Estatal, declaró: "Que el día 21 de enero de 1955, como a las 8:45 de la mañana, se personó en este Cuartel el ciudadano Rafael Flores Montañez, acompañado de Andrés Cardona Carrasquillo. Informó . . . , que en el Bo. Morcelo, donde él reside, había sido agredido con un machete por Víctor Carrasquillo Santos y que él se defendió dándole un palo y creía que lo había matado. Me dirigí al sitio de los hechos . . . Frente a la casa de Flores Montañez estaba el cuerpo de Víctor Carrasquillo Santos. Pegado al cuerpo y al lado de su mano derecha estaba este machete que ocupamos y hemos entregado al Fiscal para la investigación. El palo que también entregamos al Sr. Fiscal con que Rafael Flores Montañez agredió a Víctor Carrasquillo Santos lo ocupamos cerca del cadáver de Víctor Carrasquillo. Se tomaron fotografías del sitio por parte del fotógrafo de la Policía". Están en el expediente. Cuatro de ellas son del cuerpo del occiso.

La Sala de instancia resolvió que la prueba demostraba que Flores Montañez había privado de la vida a Carrasquillo Santos usando del derecho a la propia defensa, llegando por ese motivo a la conclusión de que no existía causa probable para su arresto.

En más de una ocasión ha dicho este Tribunal que en un procedimiento de hábeas corpus, en el que el peticionario sostiene que se encuentra encarcelado en virtud de mandamiento judicial—para responder de un delito—sin causa probable para ello, no procede decidir si es inocente o culpable, problema que sólo puede ser considerado y resuelto en el juicio correspondiente, *Benítez* v. *Calzada*, 34 D.P.R. 541; *Ex parte Ferrá*, 61 D.P.R. 401; *Ex parte Mercado*, 63 D.P.R. 913, y que lo único a determinar es si hay causa probable para que esté detenido, si no presta la fianza exigídale. [2] A tales principios queremos añadir ahora que para disponer de esa cuestión, la corte que conoce del procedimiento, tiene autoridad para examinar la evidencia presentada al juez que ordenó el arresto para ver si se adujo ante él alguna prueba compe-

tente que podía servirle de base para encontrar causa probable para creer que el peticionario perpetró el acto delictivo por el que se le encarceló, *Fernández* v. *Phillips*, 268 U. S. 311; *Ex parte Vandiveer*, 88 Pac. 993 (Cal.); *Ex parte Driggs*, 102 Pac. 542 (Cal.); *Ex parte McCarty*, 35 P.2d 568 (Cal.); *State* v. *Ross*, 170 N. W. 121 (N.D.); *State* v. *Fischer*, 298 N. W. 353 (Wis.); (¹) si aparece que no se le presentó ninguna de ese carácter, no hay justificación para el arresto; pero si por el contrario resulta que dicho magistrado tuvo evidencia sobre la cual podía fundarse para actuar, determinando la existencia de causa probable para creer en la culpabilidad del peticionario, el hábeas corpus no puede prosperar y el auto debe ser anulado, *Ex parte Becker*, 25 Pac. 9 (Cal.); *State* v. *Fischer*, supra; *Arnold* v. *Schmidt*, 143 N. W. 1055 (Wis.); *State* v. *Baeverstad*, 97 N. W. 548 (N.D.); *State* v. *Sievers*, 168 N. W. 99 (Neb.); *Ex parte Jones*, 96 Fed. 200. [3] Esa evidencia—la que basta para sostener tal determinación y ordenar el arresto preventivo de una persona, si no presta fianza, con el fin de garantizar su comparecencia a juicio para ser juzgada conforme a derecho—no tiene que ser del grado exigido para condenarle. No es necesario que demuestre su culpabilidad más allá de duda razonable, *United States* v. *Burr*, 25 Fed. Cas. 2; *Fernández* v. *Phillips*, supra; *Ex parte Jones*, supra; *Ex parte Vandiveer*, supra; *People* v. *O'Brien*, 100 P.2d 367 (Cal.); *People* v. *Mitchell*, 157 P.2d 862 (Cal.); *People* v. *Nagle*, 153 P.2d 344 (Cal.); *People* v.

---

(¹) En *Ex parte Vandiveer*, supra, el tribunal se expresó así: "El máximo poder que se nos confiere es el de decir si hay o no alguna evidencia que podría razonablemente justificar al magistrado en encontrar que aparecía causa probable para creer que el delito fué cometido por la persona acusada". Y en *Ex parte Driggs*, supra, dijo la corte: "En solicitudes de autos de este carácter [hábeas corpus], no entraremos en un examen del récord para determinar si, en nuestra opinión, existe o no testimonio que justifique el arresto, pero más bien en un examen . . . para determinar si hubo o no testimonio que autorizaba al juez instructor a actuar. En otras palabras, ¿hay en el récord evidencia tendente a demostrar la comisión de un delito y la conexión criminal del peticionario con el mismo, de la que pueda inferirse una probabilidad razonable de culpabilidad . . . ?". (Corchetes nuestros.)

*McRae*, 187 P.2d 741 (Cal.); *People* v. *Tallman*, 163 P.2d 857 (Cal.); requisito de prueba que es aplicable al juicio y no al proceso de determinar si existe o no causa probable para decretar un arresto. [4] El juez instructor puede determinar que la hay, aun cuando exista margen para abrigar alguna duda sobre la culpabilidad de aquel a quien ordena detener, *People* v. *Nagle*, supra; *Ex parte McCarty*, supra; *People* v. *McRae*, supra, y otros precedentes citados. Difícilmente podría ilustrarse mejor la doctrina a que aludimos que transcribiendo, como pasamos a hacerlo, las manifestaciones del Juez Presidente Marshall en *United States* v. *Burr*, supra, con respecto a las normas que rigen la determinación de causa probable para ordenar la encarcelación de una persona con el fin de que responda de la comisión de un delito: "Ante una solicitud de esta naturaleza no debo yo, por cierto, exigir aquella prueba que sería necesaria para la convicción de la persona arrestada, en el juicio de su causa; ni siquiera debo requerir aquella que absolutamente me convencería de la culpabilidad del acusado; pero debiera exigir y exijo que se demuestre causa probable; y por causa probable entiendo un caso que se base en prueba que ofrezca buena razón para creer que el delito ha sido cometido por la persona a quien se le imputa".

Bajo los principios apuntados, y para los limitados efectos de una determinación de causa probable para arrestar —que no debe entenderse ni considerarse en forma alguna, en un juicio, como sugestiva de la culpabilidad del acusado si se hubiera determinado que existe, ni de su exoneración definitiva si se hubiera determinado que no existe— la evidencia que tuvo ante sí el juez que decretó la existencia de causa probable para el arresto del peticionario contiene, en nuestra opinión, elementos suficientes para sostener esa determinación; conclusión ésta que nada tiene que ver con la suficiencia de dicha prueba para el propósito de una convicción, problema acerca del cual no estamos expresando, ni podríamos expresar criterio alguno, por estar totalmente fuera de la órbita de un

procedimiento de hábeas corpus como el presente. Si la evidencia que consta en autos es o no bastante para condenar a Flores Montañez, es cuestión que corresponde decidir, a tenor con las normas legales aplicables al juicio, al tribunal de derecho o al jurado que le juzgue para determinar si es inocente o culpable.

En vista de que el fiscal ya ha presentado acusación, cosa que ha podido hacer en cualquier momento de creerlo justificado, independientemente de las resultancias de este recurso, *Pueblo* v. *Tribunal Superior*, 75 D.P.R. 535 (1953) (²), y de que el proceso contra el peticionario ha de ventilarse en juicio, no creemos propio analizar aquí la prueba que tuvo ante sí el juez instructor para decretar su detención, a fin de evitar que a la conclusión de este Tribunal, circunscrita exclusivamente a la cuestión de causa probable para los fines del arresto, se le de un alcance distinto al que en efecto tiene.

En el segundo señalamiento el apelante sostiene que la Sala de instancia incidió en error "al declarar con lugar el . . . Hábeas corpus y excarcelar a Rafael Flores Montañez

---

(²) En el caso de *Pueblo* v. *Tribunal Superior*, supra, dijimos lo siguiente: "La evidencia de causa probable de la comisión de un delito público será sometida por el fiscal al magistrado por medio de declaración jurada o afirmación que induzcan a éste a creer que el acusado ha cometido el delito que se le imputa, sin que para ello sea necesaria la celebración de una vista. *Cf. Guadalupe* v. *Bravo*, 71 D.P.R. 975. Empero, a pesar de carecer el fiscal al presente de autoridad para expedir órdenes de arresto o para fijar y aprobar fianzas, él continúa teniendo autoridad para radicar acusaciones si 'cree solemnemente que existe justa causa para formularlas' —artículos 3, 72, 95 y 98 del Código de Enjuiciamiento Criminal—ya que la disposición constitucional que nos ocupa no tiene el efecto de restringir tal autoridad".

Esto consta en las páginas 67 y 68 de la transcripción de evidencia:

"Se declara con lugar el hábeas corpus y se ordena la excarcelación del acusado.

"¿Está la acusación ahí? Radíquela ahora mismo.

"Hon. Fiscal: No señor Juez, y no creo que deba hacerlo ahora.

"Hon. Juez: Debe hacerlo antes del 24 de este mes.

"Hon. Fiscal: Lo haremos dentro de una razonable rapidez más oportuna. El Ministerio Público habrá de traer el proceso a Corte mediante una acusación como una facultad exclusiva del Ministerio Público.

"Hon. Juez: Pues nadie puede obligarle, ni nadie se lo puede impedir".

ignorando·las disposiciones del artículo 55 de nuestro Código Penal".(³)  Considerando lo que hemos resuelto, no hay necesidad alguna de discutir el error apuntado.

*Se revoca la resolución apelada, y en consecuencia, el peticionario será restituído a la custodia del Alcaide demandado.*

El Juez Asociado Sr. Marrero no intervino.

El Juez Asociado Sr. Negrón Fernández disintió.

(³) El art. 55 de nuestro Código Penal lee así: "La decisión de si un homicidio fué cometido en defensa propia o no, se someterá al Tribunal o al jurado respectivo."